467 So.2d 711 (1985)
Harriet L. NESBITT, As Personal Representative of the Estate of Lawrence Nesbitt, Deceased, Appellant,
v.
COMMUNITY HEALTH OF SOUTH DADE, INC., a Florida Corporation, d/b/a Community Mental Health Center and Andrew Perfilio, M.D., Appellees.
No. 83-2751.
District Court of Appeal of Florida, Third District.
March 19, 1985.
Rehearing Denied May 10, 1985.
*712 Lawrence & Daniels and Adam H. Lawrence, Miami, for appellant.
Blackwell, Walker, Gray, Powers, Flick & Hoehl and James C. Blecke, Miami, Lanza, Sevier, Womack & O'Connor, Coral Gables, for appellees.
Before SCHWARTZ, C.J., and DANIEL S. PEARSON and JORGENSON, JJ.
DANIEL S. PEARSON, Judge.
The appellant sued Dr. Perfilio and the Community Health Center of South Dade, alleging that each was independently negligent in the treatment of the appellant's son, Larry, and that, additionally, through the application of the doctrine of respondeat superior, the Center was responsible for Perfilio's negligence. At the heart of appellant's suit was her claim that the defendants discharged Larry from the hospital when they knew or should have known that he was then suffering from a severe mental disturbance which rendered him helpless to care for himself. On the heels of his discharge, Larry, naked from the waist down, wandered onto State Road 836 and was struck and killed by a car.
The trial concluded with the court directing a verdict in favor of the Center, the jury returning a verdict in favor of Dr. Perfilio, and the court entering the appropriate judgments. Because the record contains no evidence that the Center was itself negligent, we affirm the judgment in its favor on that aspect of Nesbitt's suit. However, because, as will be seen, the judgment for Perfilio must be reversed and a new trial granted, and because there is evidence upon which a jury could find that Perfilio acted as an agent of the Center and that the Center was thus liable for his acts, the judgment for the Center must in this respect be reversed.
Although the appellant raises a number of grounds for reversal, we address only her contention that the trial court erroneously allowed evidence of the past treatment of Larry Nesbitt by other hospitals to be used as the standard of reasonable care against which Perfilio's conduct in the present case was to be measured. We agree with the appellant that this was error and that the error was harmful to the presentation of appellant's case.
The appellant's expert witness was Dr. Charles Mutter, a psychiatrist. Dr. Mutter testified that in his opinion the medication prescribed for Larry by Perfilio was not adequately titrated, Larry was still very mentally disturbed at the time of his discharge, and the discharge note was inadequate. He stated that Perfilio's treatment of Nesbitt was, in all of these respects, below the accepted standard of care.[1]
On cross-examination, counsel for the defendants, advising Mutter that the records of Jackson Memorial Hospital in Miami covering a past hospitalization of Larry Nesbitt showed that Jackson kept Nesbitt only two days and also medicated him,[2] asked whether Jackson Memorial Hospital fell below the accepted standard of care. Appellant's objection was overruled, and Mutter responded: "I don't know. I have to review the records and find out what they did, and how they came to the basis of their conclusion to answer that."
Moments later, again over appellant's objection, defense counsel embarked on the same line of inquiry, his purpose quite clear:
"Q I am here to talk about the standard of care.
"Did you have occasion to review the Bellevue and Payne Whitney Clinic records?

*713 "A I did not have any of the records.
... .
"Q Would it surprise you Doctor, that  are you familiar with Bellevue?
"A Yes.
"Q Will you tell us a little bit about that institution?
"A It is a well recognized psychiatric facility. It is an institution in New York, and it has been in existence for a number of years. Many doctors have obtained internship and residency training there because they have a tremendous wealth of clinical material.
"Q How about the Payne Whitney?
"A I don't know anything about Payne Whitney, but I recognize it as one of the institutions.
"Q It is the leading teaching center?
"A It is a respected teaching center.
"Q Would it surprise you that when the man was discharged on June 16, 1982, two or three months before this that two days prior to this discharge there wasn't a note in that chart; does that fall below the standard of care?
"MR. KELNER: Objection. Firstly, we are not trying Payne Whitney. Second, they have no knowledge of what the records did or did not show in any fashion or form.
"MR. O'CONNOR: It is creating a standard of care. What the standard of care in these facilities are. He put in issue whether or not Dr. Perfilio['s] note was adequate.
"I am asking this expert whether the fact there was no note falls below the standard of care in one of the leading institutions in the country.
"MR. KELNER: We suggest to the Court what some other institution in New York may or may not have done when they had no knowledge of what may have or may not have taken place up there is totally irrelevant to the issues to be tried in this case as to whether these Defendants fell below the standard of care.
"THE COURT: I feel the standard of care in the community or like communities is an issue in this case. It has to be in a medical malsuit.
"Q (By Mr. O'Connor) Doctor, assuming that fact to be true, does Payne Whitney fall below the standard of care?
"A It is possible, yes.
"Q If the Bellevue medical records are devoid of any mental status examination upon discharge 
"MR. KELNER: Your Honor, may I have a standing objection to this entire line of questioning?
"THE COURT: You may."
Of course, "the line of questioning" continued. Defense counsel, in the guise of the hypothetical question, related the facts as shown by the records of Jackson, Payne Whitney and Bellevue, each time ending the recitation with the question, "Did they also fall below the standard of care?" His announced purpose was to "establish the standard of care based upon ... the leading psychiatric institutions in this country." Ultimately, over appellant's objection, these hospital records were admitted in evidence.[3] Defense counsel summed up to the jury:
"What is the standard of care in this community under the circumstances, and has that standard of care been violated? The only standard of care that has been brought before you was brought in by the Defendant as evidenced by the leading psychiatric institutions in this country, and their care and treatment was well below that of C.H.I. and Dr. Perfilio. The fact remains it is inescapable. Either everyone is wrong or nobody is wrong."
As a general rule,

*714 "Customary methods or conduct do not furnish a test which is conclusive or controlling on the question of negligence, or fix a standard by which negligence is to be gauged. The standard of due care is such care as a prudent person would exercise under the circumstances of the particular case, and conformity to customary or usual conduct or methods cannot amount to more than a circumstance to be considered together with other circumstances of the case in determining whether due care has been exercised." MacDougall v. Pennsylvania Power & Light Co., 311 Pa. 387, 397, 166 A. 589, 592 (1933), quoting 45 C.J. § 87 at 707.
See Anderson v. Malloy, 700 F.2d 1208 (8th Cir.1983); Johnson v. United States, 270 F.2d 488, 491 (9th Cir.1959), cert. denied, 362 U.S. 924, 80 S.Ct. 677, 4 L.Ed.2d 742 (1960) ("[C]ustomary practice is not ordinary care; it is but evidence of ordinary care."). Otherwise stated, "[w]hat usually is done may be evidence of what ought to be done, but what ought to be done is fixed by a standard of reasonable prudence, whether it usually is complied with or not." Texas & Pacific Railway Co. v. Behymer, 189 U.S. 468, 470, 23 S.Ct. 622, 623, 47 L.Ed. 905, 906 (1903).[4],[5] The fact that a person deviates from or conforms to an accepted custom or practice does not establish conclusively that the person was or was not negligent. Anderson v. Malloy, 700 F.2d at 1212. This rule applies with equal force in medical malpractice cases.[6]See Walski v. Tiesenga, 72 Ill.2d 249, 21 Ill.Dec. 201, 381 N.E.2d 279 (1978); Darling v. Charleston Community Memorial Hospital, 33 Ill.2d 326, 211 N.E.2d 253 (1965), cert. denied, 383 U.S. 946, 86 S.Ct. 1204, 16 L.Ed.2d 209 (1966); Block v. Michael Reese Hospital and Medical Center, 93 Ill. App.3d 578, 49 Ill. Dec. 34, 417 N.E.2d 724 (1981); Hirn v. Edgewater Hospital, 86 Ill. App.3d 939, 42 Ill.Dec. 261, 408 N.E.2d 970 (1980); Rytkonen *715 v. Lojacono, 269 Mich. 270, 257 N.W. 703 (1934).
Because what is usually done is merely some evidence of the standard of care, it is admissible for that limited purpose. Its admission, however, must be qualified by a cautionary instruction to the jury that the evidence does not by itself establish a standard of care. 1 J. Wigmore, Evidence § 461 (2d ed. 1923). See Brigham Young University v. Lillywhite, 118 F.2d 836 (10th Cir.), cert. denied, 314 U.S. 638, 62 S.Ct. 73, 86 L.Ed. 512 (1941); Hellweg v. Chesapeake & Potomac Telephone Co., 110 F.2d 546 (D.C. Cir.1940). The general rule that evidence of custom bearing on the fact of negligence is admissible is, of course, subject to principles of relevancy and auxiliary policy. 2 J. Wigmore, Evidence § 461 (Chadbourn rev. 1979). See also Simonds v. City of Baraboo, 93 Wis. 40, 67 N.W. 40 (1896) (trend of decisions is liberal application of general rule, yet rigid preservation of exceptions thereto). The requirements of relevancy demand that the conduct of others must have occurred under circumstances substantially similar to the one in issue. See, e.g., Anderson v. Malloy, 700 F.2d 1208. As will be seen, infra, it is doubtful whether the records of Bellevue Hospital and certain records of Payne Whitney Hospital would meet this test of relevancy. Finally, even relevant evidence of custom may be excluded where it would, in the trial court's opinion, involve a great risk of the jury's confusion of evidential effect with legal standard of care or an undue waste of time. 2 J. Wigmore, Evidence § 461 (Chadbourn rev. 1979). See Brigham Young University v. Lillywhite, 118 F.2d 836.
In the present case, it is clear that the evidence was admitted without qualification, and the jury was left uninstructed as to its use. The appellant's burden in this case was to prove by the greater weight of the evidence that Perfilio's treatment of Nesbitt fell below the accepted standard of care; it was not, as it came to be during trial, to prove that Jackson, Bellevue and Payne Whitney Hospitals were also negligent, that is, to show, in defense counsel's words, that "everyone is wrong" or risk the jury finding that "nobody is wrong."
The error of admitting this evidence as the accepted standard of care is exacerbated by the fact that the events reflected in records of Bellevue and certain records of Payne Whitney appear to be not sufficiently similar as to allow their use even as evidence of custom. Even assuming, arguendo, that the intensity of Nesbitt's mental disturbance was the same in all of these instances, notations on the records of Bellevue and certain records of Payne Whitney show Nesbitt's discharge therefrom was at his family's insistence and against medical advice. One can hardly compare Perfilio's decision to discharge with Payne Whitney's and Bellevue's recommendation against discharge,[7] and the records and questions based on them should have been entirely excluded from the trial. Although the Jackson records do not appear to be similarly disqualified, we sound this caveat to the trial court upon retrial:
"LORD O'HAGAN, in Metropolitan Asylum District v. Hill, 47 L.T.N.S. 29, 31 (1882) (speaking for the rejection of evidence of the effects of other hospitals in spreading contagion, offered to show the noxious quality of the one in question): Without proof as to the state and management of the other hospitals, so as to establish a substantive similarity, any inference drawn from a comparison of their operation with that of the H. asylum might have been quite fallacious and deceptive. But, even without regard to this, ... it would have involved the jury in a multitude of collateral inquiries, calculated to confuse and embarrass them, and it might have been endlessly prolonged *716 by an indefinite multiplication of objects of comparison. To keep such investigations within reasonable limits, and secure promptitude, precision, and satisfaction in the demonstration of justice, it seems to me that Courts should be very jealous of the admission of such proof." Quoted in 2 J. Wigmore, Evidence § 461 (Chadbourn rev. 1979).
Should these impediments to admission be overcome to the trial court's satisfaction then the qualified records may be admitted as evidence bearing on the standard of care, provided that the jury is appropriately instructed.
Reversed and remanded for a new trial.
JORGENSON, Judge, concurring in part, dissenting in part.
I agree that the trial court properly directed a verdict in favor of the Center because the record contained no evidence that the Center was negligent. I respectfully dissent from that portion of the court's opinion which reverses the judgment in favor of Dr. Perfilio. I also dissent from that portion of the court's opinion which permits a new trial against the Center on an agency theory. The trial court's judgment should be affirmed if the record as a whole reflects any theory on which the judgment can be supported. See Firestone v. Firestone, 263 So.2d 223, 225 (Fla. 1972).
Addressing first the procedural issues, I do not believe that any error was properly preserved regarding the admission of the hospital records. Only a general hearsay objection was raised with respect to the admission of the records. There was no specific objection or request for a limiting instruction nor did plaintiff ask the trial court to remove any portions of the hospital records which were deemed offensive. The hospital records in cases of this nature are relevant and admissible under section 90.803, Florida Statutes (1983). See Exchange National Bank of Tampa v. Hospital & Welfare Board of Hillsborough County, 181 So.2d 9 (Fla. 2d DCA 1965) (construing Uniform Business Records as Evidence Act), cert. denied, 188 So.2d 806 (Fla. 1966). In the face of a general and nonspecific objection, the trial court properly overruled. See Caldwell v. Peoples Bank of Sanford, 73 Fla. 1165, 1174, 75 So. 848, 852 (1917). Even if the hospital records in this case were improperly admitted, their admission is harmless at best and, therefore, should not serve as a basis for a reversal and a new trial in this case. See § 924.33, Fla. Stat. (1983).
My basic disagreement with the court's decision is premised on entirely different grounds. In my view, Dr. Perfilio was entitled to a directed verdict at the close of the plaintiff's case. The plaintiff's theory of liability is predicated upon her expert's testimony that the medication had not properly titrated and that the treating psychiatrist had not prepared an adequate discharge summary. Neither theory, separately or together, is sufficient to impose liability in a case of this nature. At the most, the evidence in this case suggests a difference in judgment between plaintiff's expert and the defendant (an expert himself) regarding when the medication would be fully effective and a release appropriate. As the court stated in Bourgeois v. Dade County, 99 So.2d 575 (Fla. 1957),
[p]hysicians are not to be held liable for honest errors of judgment. They are allowed a wide range in the exercise of their judgment and discretion. To hold one liable it must be shown that the course which he pursued was clearly against the course recognized as correct by his profession.
Bourgeois, 99 So.2d at 577. See also Blackwell v. Southern Florida Sanitarium & Hospital Corp., 174 So.2d 45 (Fla. 3d DCA 1965). That standard, which I believe to be the prevailing law, is even more compelling in cases where psychiatrists are involved. Courts have found no liability where, based upon a medical judgment made after the patient's condition is diagnosed, the patient is released and subsequent events prove the decision was erroneous, see Cameron v. State, 37 A.D.2d 46, 322 N.Y.S.2d 562 (N.Y. App. Div. 1971), aff'd, *717 30 N.Y.2d 596, 331 N.Y.S.2d 30, 282 N.E.2d 118 (1972) (state hospital doctors determined patient not psychotic and after release patient attacked a minor); Taig v. State, 19 A.D.2d 182, 241 N.Y.S.2d 495 (N.Y. App. Div. 1963) (state not liable for alleged wrongful release of psychotic patient where decision a matter of professional medical judgment); St. George v. State, 283 A.D. 245, 127 N.Y.S.2d 147, aff'd, 308 N.Y. 681, 124 N.E.2d 320 (1954) (state not liable for honest error of staff in releasing mental patient who later committed murder); and courts disfavor hindsight arguments that a psychiatrist is negligent because subsequent events proved he erred in his earlier judgment. E.g., Dillmann v. Hellman, 283 So.2d 388 (Fla. 2d DCA 1973) (hindsight arguments are no substitute for admissible evidence and disregard fact that physicians must be allowed wide range in exercising judgment and discretion).
The unrefuted evidence is that Lawrence Nesbitt was a chronic schizophrenic who, unless medicated, had a tendency to wander. There is no suggestion that Nesbitt represented a danger to himself or to others. Dr. Perfilio's testimony regarding his conclusion that Nesbitt did not qualify for continued involuntary institutionalization under the Baker Act is unrebutted on this record. Plaintiff's expert agreed that the diagnosis and institutional treatment that was received by Nesbitt was appropriate. Florida's strong policy of employing the least restrictive treatment alternative when dealing with persons affected by mental health problems is evidenced throughout chapter 394 of the Florida Statutes. That policy should be enforced by denying liability in cases such as this.
The science of psychiatry represents the penultimate grey area.[1] Numerous cases underscore the inability of psychiatric experts to predict, with any degree of precision, an individual's propensity to do violence to himself or others. See generally Annot., 17 A.L.R.4th 1128, 1142 (1982); Annot., 6 A.L.R.4th 1155, 1180 (1981); Annot., 38 A.L.R.3d 699, 704, 710 (1971). Indeed, "[p]sychiatrists themselves would be the first to admit that however desirable an infallible crystal ball might be, it is not among the tools of their profession." People v. Burnick, 14 Cal.3d 306, 326, 121 Cal. Rptr. 488, 501, 535 P.2d 352, 365 (1975). See In re Ballay, 482 F.2d 648, 665-66 (D.C. Cir.1973).
A substantial body of literature suggests that the psychiatric field cannot even agree on appropriate diagnosis, much less recommend a course of treatment. See generally 1 J. Ziskin, Coping with Psychiatric and Psychological Testimony (3d ed. 1981).
Unlike a physician's diagnosis, which can be verified by x-ray, surgery, etc., the psychiatrist cannot verify his diagnosis, treatment or predicted prognosis except by long-term follow-up and reporting. Lacking proof, based on long-term follow-up of an individual psychiatric expert's reliability, a court has little or no basis for determining whether the particular psychiatric expert on the stand is qualified or not.
Almy, Psychiatric Testimony: Controlling the "Ultimate Wizardry" in Personal Injury Actions, 19 The Forum 233, 243 (1984). See also Estate of Roulet, 23 Cal.3d 219, 230, 152 Cal. Rptr. 425, 431, 590 P.2d 1, 7 (1979) (noting "that `the divergence of expert views ... render[s] the possibility of mistake significantly greater [in the diagnosis of mental illness] than in diagnosis of physical illness'" (citation omitted)).
The United States Supreme Court recently stated: "Psychiatry is not, however, an exact science, and psychiatrists differ widely and frequently on what constitutes mental illness, on the appropriate diagnosis to be attached to given behavior and symptoms, on cure and treatment, and on likelihood of future dangerousness." Ake v. Oklahoma, ___ U.S. ___, ___, 105 S.Ct. *718 1087, 1096, 83 L.Ed.2d ___, ___ (1985). "The Court appropriately takes notice of the uncertainties of psychiatric diagnosis and therapy, and the reported cases are replete with evidence of the divergence of medical opinion in this vexing area." Furthermore, "[t]here can be little responsible debate regarding `the uncertainty of diagnosis in this field and the tentativeness of professional judgment.' (Citation omitted.)" O'Connor v. Donaldson, 422 U.S. 563, 579, 584, 95 S.Ct. 2486, 2495, 2498, 45 L.Ed.2d 396, 409, 412 (1975) (Burger, C.J., concurring). See generally Morse, Crazy Behavior, Morals, and Science: An Analysis of Mental Health Law, 51 S.Cal.L.Rev. 527 (1978).
Courts should be reluctant to impose liability upon therapists because of the inherent reliability problems. See, e.g., Brady v. Hopper, 570 F. Supp. 1333 (D.Colo. 1983); Johnson v. United States, 409 F. Supp. 1283 (M.D.Fla. 1976), rev'd and remanded, 576 F.2d 606 (5th Cir.1978), aff'g dismissal on other grounds, 631 F.2d 34 (5th Cir.1980), cert. denied, 451 U.S. 1018, 101 S.Ct. 3007, 69 L.Ed.2d 389 (1981).[2]See Taig, 241 N.Y.S.2d at 496-97 (imposition of liability each time erroneous prediction made of future course of mental disease would inhibit decisions to release patients). See also Ennis & Litwack, Psychiatry and the Presumption of Expertise: Flipping Coins in the Courtroom, 62 Calif.L.Rev. 693 (1974).
In a medical malpractice action the duty owed by a psychiatrist to a patient must be measured by the foreseeability of the risk. Among the factors to be considered in cases of this nature are the risk itself, the foreseeability and likelihood of injury weighed against the social utility of the physician's conduct, the magnitude of guarding against the injury, and the consequences of placing that burden on the psychiatrist, see Brady v. Hopper, 570 F. Supp. at 1337 n. 3; see also Palsgraf v. Long Island R.R., 248 N.Y. 339, 162 N.E. 99 (1928). In the absence of any evidence other than Nesbitt's tendency to wander, Dr. Perfilio had no reason to predict that, upon release, Nesbitt would endanger himself.[3] The judgmental decision to release is one of the medical and public risks which must be taken on balance even though sometimes it may result in injury to the patient. Taig.[4]
The court's decision to remand for a new trial requires my brother Chief Judge Schwartz's fabled triplets of conjecture, speculation, and surmise, see Pena v. Allstate Insurance Co., 463 So.2d 1256, 1259 (Fla. 3d DCA 1985) (Schwartz, C.J., dissenting in part), to be placed before the jury. A new trial on the evidence in this case takes us "from the world of reality into the wonderland of clairvoyance," Tarasoff v. Regents of University of California, 17 Cal.3d 425, 451, 131 Cal. Rptr. 14, 33, 551 P.2d 334, 354 (1976) (Mosk, J., concurring and dissenting). The law requires some evidence of reality.
I, therefore, would affirm the judgment below in all respects.
NOTES
[1] "The accepted standard of care for a given health care provider shall be that level of care, skill, and treatment which is recognized by a reasonably prudent similar health care provider as being acceptable under similar conditions and circumstances." § 768.45, Fla. Stat. (1981).
[2] Mutter had testified that he had not examined these records.
[3] It is clear that they were offered to prove the standard of care only. Dr. Perfilio had not examined them and did not rely upon them for any purpose during his treatment of Nesbitt; Dr. Mutter had not seen them and did not rely upon them in forming his opinion. To the extent that the records contain some arguably admissible material, it does not appear that the offer was so limited or that they were admitted for a limited purpose.
[4] The danger of a rule declaring that what is usually done fixes the standard of reasonable care is that it precludes the imposition of a standard of conduct higher than that which is customary. As Judge Learned Hand once observed:

"There are, no doubt, cases where courts seem to make the general practice of the calling the standard of proper diligence; we have indeed given some currency to the notion ourselves. Indeed in most cases reasonable prudence is in fact common prudence; but strictly it is never its measure; a whole calling may have unduly lagged in the adoption of new and available devices. It never may set its own tests, however persuasive be its usages. Courts must in the end say what is required; there are precautions so imperative that even their universal disregard will not excuse their omission."
The T.J. Hooper, 60 F.2d 737, 740 (2d Cir.) (citations omitted), cert. denied sub nom. Eastern Transportation Co. v. Northern Barge Corp., 287 U.S. 662, 53 S.Ct. 220, 77 L.Ed. 571 (1932).
[5] Yet, in Weireter v. Great Northern Ry. Co., 146 Minn. 350, 178 N.W. 887, 889 (1920), while the court acknowledged that proving that something was done in the customary way does not necessarily prove that it was not done negligently, it also noted that when a plaintiff demonstrates that the allegedly negligent act was performed in the customary way, the inference arises that no negligence has been proven, and "the action must fail unless he adduces some evidence by way of experts or otherwise that will justify the jury in concluding that, even though the act was done according to the usual custom, it was nevertheless negligently done, or unless it may be said that the common experience of the ordinary juror makes him competent to determine, without aid of evidence, whether or not the act was negligently performed." In the present case, the appellant established through Dr. Mutter that Perfilio's treatment of Nesbitt fell below the standard of reasonable care in this community.
[6] It has been argued that in medical malpractice cases, and presumably in cases involving other sophisticated callings, that the defendant doctor who establishes that his conduct conformed to the custom should be entitled to a directed verdict in his favor. Morris, Custom and Negligence, 42 Col.L.Rev. 1147, 1163 (1942). This same commentator reasons that considering all the factors, this is the only workable test:

"The law may be academically deficient in countenancing an excuse that may occasionally be based on the negligence of other doctors. But the grossly incompetent practitioner will find little comfort in the tests of malpractice. A few negligent doctors may escape, but the quack will not." Id. at 1165.
See also Brown v. Hughes, 94 Colo. 295, 30 P.2d 259 (1934).
[7] We recognize, of course, that these Payne Whitney and Bellevue records may thus be said to cut in favor of the appellant's position. However, the records were placed in evidence incidental to the cross-examination of Dr. Mutter, who was totally unfamiliar with them and was never given an opportunity to examine them.
[1] I agree that "psychiatry is at best an inexact science, if, indeed, it is a science ...," Suggs v. La Vallee, 570 F.2d 1092, 1119 (2d Cir.) (Kaufman, C.J., concurring), cert. denied, 439 U.S. 915, 99 S.Ct. 290, 58 L.Ed.2d 263 (1978).
[2] Georgia law formed the basis for a prior judgment of negligence in a connected case and, the district court, as the Fifth Circuit noted in its reversal and remand of Johnson, was precluded under federal collateral estoppel from relitigating the issue of negligence and finding non-negligence.
[3] Even if Dr. Perfilio improperly released Nesbitt, that act cannot be found to be the proximate cause of Nesbitt's ultimately being killed by an automobile while he was walking along the highway. See, e.g., Moon v. United States, 512 F. Supp. 140 (D.Nev. 1981) (ultimate death by drowning of patient permitted to go on outing not foreseeable by reasonably prudent person; hindsight unavailable to court).
[4] For a useful discussion of social science methodology and its appropriate reception in the courts, see generally J. Monahan & L. Walker, Social Science in Law: Cases and Materials (1985).