725 So.2d 1181 (1998)
Ralph GERBER, individually, Rowena Gerber, his wife, and as natural parents and guardians of Bradley Gerber, Steven Gerber and Hilary Gerber, individually, Appellants,
v.
Ramanuja IYENGAR, M.D., Ramanuja Iyengar, M.D. & Associates, P.A., Appellees.
No. 97-1481
District Court of Appeal of Florida, Third District.
December 23, 1998.
Rehearing Denied March 10, 1999.
*1182 Holland & Knight and Daniel S. Pearson and Christopher N. Bellows, Miami, for appellants.
George Hartz Lundeen Flagg & Fulmer; Hicks & Anderson and Ila J. Klion, James E. Tribble and Ralph O. Anderson, Miami, for appellees.
Before NESBITT, SHEVIN and SORONDO, JJ.
SORONDO, J.
Ralph Gerber (Gerber), his wife Rowena Gerber, and their children Bradley Gerber, Steven Gerber and Hillary Gerber appeal the lower court's final judgment in favor of defendants Ramanuja Iyengar, M.D. and Ramanuja Iyengar, M.D. & Associates, P.A.
Gerber was admitted to the Miami Heart Institute with chest pains. Dr. Iyengar diagnosed him as suffering from unstable angina. That evening, a nurse reported that Gerber's heartbeat was irregular and that he had gone into atrial fibrillation. At Dr. Iyengar's request, the on-duty critical care physician examined Gerber and found his treatment to be appropriate. The next morning Dr. Iyengar re-examined Gerber and scheduled him for a cardiac catheterization the following day.
During the procedure, Dr. Iyengar did not administer heparin, a blood thinner used to prevent clots, (though Gerber had received heparin throughout the previous night and within minutes of the catheterization). During the catheterization Gerber suffered a stroke. As soon as Dr. Iyengar noticed Gerber's ensuing paralysis, he administered a 5000 unit bolus of heparin.[1] Gerber and his family sued Dr. Iyengar for malpractice.
*1183 At trial, Gerber relied on the testimony of Dr. Bonnie Weiner, who testified that a left-side catheterization like the one performed on Gerber requires a bolus of heparin given at the site of catheterization, regardless of the patient's diagnosis. Dr. Iyengar's expert, Dr. Stephen Oesterle, opined that there is no rigid standard for the use of heparin during an ordinary left-side catheterization, regardless of the context in which it is performed. He testified that the prophylactic heparinization prescribed by Dr. Iyengar was well above the standard of care.
As to causation, Dr. Weiner testified that Gerber's stroke was caused in one of three ways: 1) a blood clot traveling from the left atrium of the heart to the brain, 2) a blood clot dislodged by the catheter which traveled to the brain, or 3) a piece of plaque from the aorta superimposed with a blood clot and traveled to the brain. Dr. Weiner stated that adequate heparinization would have had a beneficial effect on any of these scenarios. To support these blood clot theories, Gerber called Dr. Thomas Nadich, who testified that Gerber had blood clots in two different areas of the brain, the middle cerebral and the choroidal arteries, which resulted in a stroke. However, on cross-examination, he admitted that he had never seen a clot in the anterior choroidal artery, but rather reasoned that since there was a resulting infarct of that artery, there must have been a blood clot.
Dr. Oesterle testified that Gerber had incurred a catheter-induced stroke, the most common cause of stroke during catheterizations. These strokes generally occur from the catheter disrupting plaque of the aortic wall. Dr. Robert Zimmerman confirmed that plaque caused Gerber's stroke. Dr. Victor Marder opined that there was no chance that a blood clot came from the left atrium causing Gerber's stroke.
On cross-examination of Dr. Oesterle, Gerber's counsel asked him whether he considered a textbook written by Dr. William Grossman and Dr. Donald Baim as a standard text on cardiac catheterization. After Dr. Oesterle recognized the text's authoritativeness, he was asked whether he agreed with Dr. Baim's recommendation that at least 5000 units of heparin be used on a patient at the time of catheterization. Dr. Oesterle testified that he did not agree. On redirect, Dr. Iyengar's counsel asked Dr. Oesterle whether he believed that Dr. Baim's recommendation was a standard or mandate. Dr. Oesterle stated that it was neither. He then relayed to the jury a conversation that he had with Dr. Baim regarding the heparin recommendation. Over Gerber's objection, Dr. Iyengar's expert told the jury about his private conversations with Dr. Baim, including Dr. Baim's statements that he did not mean what he wrote in the treatise, that it was okay for Dr. Iyengar to overlook heparin, and that no-heparin was the proper standard. Gerber argued that these conversations were hearsay, but the trial court allowed the evidence.
Finally, Gerber's expert, Dr. Nadich, testified that Gerber's first CAT scan showed that he had clots in both his middle cerebral and choroidal arteries, which ultimately resulted in his stroke. Dr. Iyengar's expert, Dr. Zimmerman, testified that physiologically, if the CAT scan evidenced a clot in the middle cerebral artery, then because of the visual similarities, the CAT scan would also evidence a clot in the basilar artery. Dr. Zimmermann reasoned that since Gerber did not have any symptoms of a clot in the basilar artery, there could not be a clot in the middle cerebral artery. Dr. Zimmerman stated that Gerber was not in a "locked-in" state (the inability to remain awake or respond to stimuli), and that he didn't believe Gerber to be blind, two symptoms of a clot in the basilar artery. Gerber then sought to introduce rebuttal evidence to show that he had visual field blindness, but the court did not allow it.
The jury returned a verdict for Dr. Iyengar. Gerber moved for a new trial and the motion was denied. Final judgment was entered against the Gerbers. This appeal followed.
Gerber claims that he is entitled to a new trial and argues that there were three critical errors below: 1. The trial court erred in prohibiting Gerber from showing Dr. Iyengar's standard of practice. 2. The trial court erred in allowing Dr. Iyengar to use Dr. Oesterle as a conduit for Dr. Baim's hearsay *1184 statements. 3. The trial court erred in denying Gerber the opportunity to present rebuttal evidence concerning Dr. Zimmerman's opinion that he (Gerber) was not blind. For the reasons which follow, we agree and reverse.

I
In an effort to establish the standard of care, Gerber secured medical records of catheterizations previously performed by Dr. Iyengar. These records, presented to the trial court on a chart entitled "Dr. Iyengar's Other Patients with Unstable Angina and/or Atrial Fibrillation at Miami Heart Institute for 1993'94," summarized sixty-seven cardiac catheterizations performed by Dr. Iyengar during the indicated period of time. Of these, in excess of fifty reflected the administration of a heparin bolus of the type Dr. Iyengar denied using on a regular basis. The trial court refused to admit the exhibit.
Evidence of a doctor's customary practice is relevant in a medical malpractice case. See Amente v. Newman, 653 So.2d 1030 (Fla.1995); Nesbitt v. Community Health of South Dade, Inc., 467 So.2d 711 (Fla. 3d DCA 1985). In this case, Dr. Iyengar's established, consistent and repeated practice of administering a 1000 to 2000 unit bolus of heparin to his patients at the time of catheterization was therefore relevant to establish the appropriate standard of care. He correctly argues, however, that this prior conduct is not conclusive on the issue of negligence. See Nesbitt, 467 So.2d at 714. In Nesbitt, this Court determined that "what is usually done is merely some evidence of the standard of care, it is admissible for that limited purpose. Its admission, however, must be qualified by a cautionary instruction to the jury that the evidence does not by itself establish a standard of care." Id. at 715 (emphasis added); see also, Doctors Memorial Hospital, Inc. v. Evans, 543 So.2d 809 (Fla. 1st DCA 1989). Nevertheless, although Dr. Iyengar's prior conduct in substantially similar cases is not, by itself, determinative of negligence in this case, it is extremely significant and its exclusion was error.[2]
Dr. Iyengar argues that the cases involving his past clients are not sufficiently similar to Gerber's case to be relevant. We disagree. The trial judge, herself, commented that the prior cases were "substantially similar" to the present case.
Next, he argues that the trial judge properly exercised her discretion in excluding this evidence under section 90.403, Florida Statutes (1997), in that its probative value was substantially outweighed by its potential for unfair prejudice. In this regard, Dr. Iyengar postulates that admission of his prior conduct "would be only the beginning of a long and distracting controversy ranging far afield from the real issues in this case." Again, we disagree. The standard of care in a medical malpractice case is the real issue in the case. If valuable judicial time is to be expended in litigation, it is this very type of issue on which such time should be invested. Clearly, the introduction of this highly probative evidence will be time consuming, for it is axiomatic that Dr. Iyengar must be allowed to fully explore the similarities, or lack thereof, between the present and previous cases. Nevertheless, considerations of expedience must yield to the overriding importance of fairness.[3]
*1185 Finally, Dr. Iyengar argues that the previous cases are cumulative to the testimony of Gerber's expert, Dr. Weiner. Consequently, even if the trial judge erred by excluding the evidence, the error was harmless. Once again, we disagree. Dr. Weiner testified that Dr. Iyengar departed from an acceptable medical standard by failing to administer a 1000 unit bolus of heparin when he catheterized Gerber. The evidence of Dr. Iyengar's previous cases can hardly be considered to be cumulative to Dr. Weiner's opinion, as it is of a completely different nature. Dr. Weiner's testimony is, like the testimony of all witnesses hired for the purpose of litigation, highly impeachable on the grounds that the witness is motivated to say whatever he or she has been paid to say. On the other hand, the evidence of Dr. Iyengar's own standards of practice, during a time when his sole concern was the welfare of his patients, is virtually unimpeachable except in so far as the past cases may be distinguishable from the present case.

II
As concerns Dr. Oesterle's testimony on redirect that he had personally spoken to Dr. Baim concerning the statements in his treatise, we conclude that this testimony was improper. It is clear that Dr. Baim's statements to Dr. Oesterle were inadmissible hearsay. As this Court stated in Smithson v. V.M.S. Realty, Inc., 536 So.2d 260, 261-62 (Fla. 3d DCA 1988):
Although an expert witness is entitled to render an opinion premised on inadmissible evidence when the facts and the data are the type reasonably relied on by experts on the subject, Bender v. State, 472 So.2d 1370 (Fla. 3d DCA 1985); Sikes v. Seaboard Coast Line R. Co., 429 So.2d 1216, 1222 (Fla. 1st DCA) review denied, 440 So.2d 353 (Fla.1983); Gomez v. Couvertier, 409 So.2d 1174 (Fla. 3d DCA 1982);... the witness may not serve as a conduit for the presentation of inadmissible evidence. See Sikes, 429 So.2d at 1222-23.
See also Everett v. State, 97 So.2d 241 (Fla. 1957); Erwin v. Todd, 699 So.2d 275 (Fla. 5th DCA 1997); Maklakiewicz v. Berton, 652 So.2d 1208 (Fla. 3d DCA 1995); Kurynka v. Tamarac Hosp. Corp., Inc., 542 So.2d 412 (Fla. 4th DCA 1989). In the present case Dr. Iyengar sought to do exactly what the case law forbids: to use Dr. Oesterle to serve as a conduit for Dr. Baim's inadmissible hearsay opinion. As a result, Dr. Baim's highly impeachable statement to Dr. Oesterle (if the statement was made, it would be directly contrary to what Dr. Baim had previously written in what was established to be an authoritative publication), was presented for the jury's consumption without affording Gerber an opportunity to cross-examine.

III
The final issue raised by Gerber is that the trial court erred when it prevented him from presenting rebuttal evidence that would have established that he was, in fact, blind.
During his case-in-chief Dr. Iyengar called a neurologist, Dr. Zimmerman. This doctor testified that heparin could only serve to deter a clot-related stroke. He postulated that Gerber had not had such a stroke because if he had, the clot would have damaged the part of the brain that controls eyesight and Gerber would be blind. Dr. Zimmerman then offered his opinion that Gerber was not blind. Although he had never conducted a physical examination of Gerber, Dr. Zimmerman based his opinion on the basis that: "I can see him sitting here, and he's looking at me, so I don't think he's blind."
Gerber then sought to introduce proof that he was, in fact, blind, but the trial court would not allow it, saying:
I think the jury can see there is a visual limitation. Maybe it's not nailed down like *1186 you would like it, ..., but I don't believe we need this.
Gerber argues that this decision was an abuse of discretion, and, as such, error. We agree. The law is clear that a trial court abuses its discretion when it forbids the presentation of rebuttal evidence that negates the theory of defense. See Mendez v. John Caddell Constr. Co., 700 So.2d 439, 440-41 (Fla. 3d DCA 1997); Zanoletti v. Norle Properties, Corp., 688 So.2d 952, 954 (Fla. 3d DCA 1997). In Young-Chin v. City of Homestead, 597 So.2d 879 (Fla. 3d DCA 1992), this Court stated that a trial judge abuses his or her discretion when he or she restricts
rebuttal which goes to the heart of the principal defense and which is not cumulative of evidence presented in plaintiffs' case in chief ...
Id. at 883. Dr. Iyengar argues that this testimony did not go to the heart of his defense. We disagree. Dr. Zimmerman's testimony raised the inference that because Gerber was not blind, his stroke was not clot-related and consequently the use or non-use of a heparin bolus would be irrelevant to his present condition. This conclusion is absolutely integral to Dr. Iyengar's defense.
For the reasons discussed above we reverse the final judgment entered below and remand this case for a new trial to be conducted in a manner consistent with this opinion.
NOTES
[1] Bolus is defined as "a concentrated mass of a medicine or other pharmaceutical preparation administered intravenously ..." J.E. Schmidt, M.D., Attorney's Dictionary of Medicine (1998).
[2] We note that at one point in this case, while arguing motions, Dr. Iyengar argued that his personal standard of practice was relevant to the standard of care and that his standard was "no heparin." While arguing the admissibility of such evidence defense counsel, alluding to the Nesbitt decision, stated:

They will get a cautionary charge from your Honor in accordance with this case decision and there is just not a question that our doctor has a right to explain why he did it and what success he has had in the past. If he established a standard of care or standard practice and procedure in his office, had not followed it and had received an untoward result, certainly they could point that out to the jury. They can ask him very clearly and concisely how come that's what you have done in your practice for the last 10 years and every case of this kind and you didn't do it this time. (Emphasis added).
[3] The determination of how many instances of previous, similar conduct should be admitted is a matter within the sound discretion of the trial court and will undoubtedly vary from case to case. It is clear, however, that the probative force of such prior conduct lies as much in its frequency as in its similarity. Accordingly, once the plaintiff has established substantial similarity between the previous and present conduct, the trial court should allow enough examples of the previous conduct to establish a frequency sufficient to persuasively establish the standard of care. In the present case, we accept the trial judge's assessment of the sufficiency of the similarity between Dr. Iyengar's previous and present conduct. We are also satisfied that Gerber's proffer of evidence of Dr. Iyengar's previous catheterizations is reasonable and should be admitted in its entirety.