# Third District Court of Appeal

## State of Florida

Opinion filed January 27, 2021.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D19-1920
Lower Tribunal No. 17-18241

_____

## Gail Johnson Dayes, etc.,

Appellant,

vs.

## Werner Enterprises, Inc., et al.,

Appellees.

An Appeal from the Circuit Court for Miami-Dade County, Antonio Arzola, Judge.

Falk, Waas, Hernandez & Solomon, P.A., and Glenn P. Falk; Russo Appellate Firm, P.A., and Elizabeth K. Russo and Paulo R. Lima, for appellant.

The Brownlee Law Firm, P.A., and Michael M. Brownlee (Orlando), for appellees.

Before LOGUE, SCALES and LINDSEY, JJ.

LOGUE, J.

In this wrongful death case, Gail Johnson Dayes, the personal representative of the estate of her husband Harold Dayes, appeals a final judgment entered after a jury trial. Dayes was killed at work when a tractor-trailer backed over him. Mrs. Dayes sued Werner Enterprises, Inc., the owner of the tractor-trailer, and its employee, Vincent Minott, the driver (hereinafter, collectively "the Defendants"). Among other things, Mrs. Dayes contends the trial court erred in allowing the Defendants to read to the jury the deposition of a police detective who testified that another officer told him Dayes had an earbud in his ear when lying on the ground after the accident. We reverse because this testimony constituted inadmissible hearsay and the Defendants, as the beneficiaries of the error, have not met their high burden of establishing "there is no reasonable possibility that the error contributed to the verdict." Special v. W. Boca Med. Ctr., 160 So. 3d 1251, 1256–57 (Fla. 2014).

**FACTS**

The accident happened one morning around eight at a Coca-Cola distribution center in Broward County, Florida in 2017. Harold Dayes was a 63-year-old security guard working for a third-party contractor named Securitas Security Services USA. He was tasked with logging tractor-trailers out of the distribution center. Dayes would check the load of a trailer and affix

2

a seal to its doors before the trailer left the property. He had been working this job for approximately one month before his death. The tractor-trailer that killed him was owned by another third-party contractor named Werner Enterprises, Inc. and driven by its employee, Vincent Minott.

The trial got off to a rocky start in voir dire when the Defendants asked a juror "Could you imagine how you'd feel if somebody told you [that] you killed someone and you don't think it's your fault? Do you think there's pain and suffering on both sides of this equation?" The trial court sustained an objection but denied a mistrial. The Defendants, however, returned to this theme in their opening ("Mr. Minott . . . lives this day every day. Particularly on Sundays because he remembers having conversations with Mr. Dayes about watching football . . . And so it particularly hits him on Sundays . . . . We're going to ask you to avoid making this tragedy worse . . . ."). The trial court again denied a mistrial.

During the trial, it was undisputed that in the moments before the accident, Minott drove a tractor-trailer out of a warehouse bay. He realized the truck was empty, got out of the cab, and showed Dayes the paperwork and the number on his trailer. They agreed the empty trailer had to be returned to the warehouse. At this point, the parties presented competing narratives. The Plaintiff contended that Minott walked quickly back to the cab,

3

rejected the longer, but safer option of driving forward to return to the bay, and negligently backed up without taking basic precautions like first locating Dayes and ensuring he was not behind the trailer, even if this involved getting out of the truck again.

The Defendants contended that Minott told Dayes he intended to return the empty tractor-trailer by backing up. Minott walked back to the cab, climbed in, carefully checked his mirrors, could reasonably assume Dayes had gone back into his office, had no reason to think Dayes would have moved to the blind spot behind the trailer, twice honked his horn, and slowly backed up at a rate that allowed Dayes ample latitude to step clear if Dayes had been paying attention.

Much of the Plaintiff's case was devoted to attacking alleged inconsistencies in the driver's version of events. One potential inconsistency concerned whether Minott actually sounded his horn. For example, the one independent witness to the accident did not hear the driver sound the truck horn; that witness, however, was using a loud pressure cleaner at the time. Minott also said that at one point he honked the truck's quieter "city horn" and, at another point, the truck's louder "air horn." The Plaintiff's attacks on Minott's testimony were sufficiently persistent that the trial court allowed the

Defendants to bolster Minott's testimony with a prior consistent statement, to which the Plaintiff objected.

Given the attacks on Minott's testimony, the question of why, if Minott had sounded his horn, Dayes had ignored it, became a feature of the trial. For example, the Defendants set up this question for the jury by asking their own driver, Minott, whether he could understand why Dayes ignored the horn:

> Q. Can you think of any reason, based on how long you've been around tractor trailers, why someone that was anywhere near your vehicle wouldn't have heard your air horns?
> A. I don't know how -- how he didn't hear. That's the reason why I honk it twice.

After posing the question, the Defendants answered it: Dayes was wearing at least one earbud. Over the Plaintiff's hearsay objection, the trial court allowed the Defendants to read a portion of the deposition of Detective Morales who conducted a traffic homicide investigation. In the disputed testimony, Detective Morales testified that another officer, Sergeant Franks, told him that Dayes had been wearing at least one earbud as he lay dying on the ground after the accident:

> Q. All right. Were you able to determine whether the deceased was using any equipment, like a headset or a cell phone or anything like that?

5

A.     There is a -- there is a comment in my report. Sergeant Franks advised me he did have -- there was a statement in my report. You can, I guess, get it from Sergeant Franks -- did advice that he was . . . he did have a Bluetooth-type headset. He described it as earbuds which connect behind. And he advised me there was at least one in the ear at the time when he was trying to administer first aid. He could not tell if the other one was in or out. He could not recall.

The Defendants' expert testified at length regarding his opinion that the use of earbuds by Dayes explained how Minott could sound the horn but Dayes not heed it:

Q.     Now, as a part of your analysis, have you considered the impact that wearing earbuds would have had on Mr. Dayes's ability to hear the auditory cues that were going on around him before the backing maneuvers had begun?

A.     Yes, sir.

Q.     And what opinion have you developed with respect to the use of air bud -- earbuds, I'm sorry.

A.     So if Mr. Dayes was wearing an earbud, it would reduce the amount of sound transmitted through that one ear. So we know that earbuds were recorded as part of his belongings and were reported as something that he carried with him. However, we don't know what those earbuds are, but if they were being used, then within that ear, it would reduce the amount of sound transmitted.

Q.     Okay. And would that be true if he had them in both ears or one ear? Help me understand that a little bit.

6

A. So any ear that had an earbud within it, that ear would experience a reduction in the amount of sound transmitted.

Q. If we assume for a moment that Mr. Dayes had an earbud in only one ear, how would that impact -- and the other ear was empty, how would that impact his ability to hear the various auditory cues going on before this vehicle began its backing maneuver?

A. So that would reduce the sound in the one ear. It would not affect the sound transmission through the other unplugged ear.

Q. All right. And if he was wearing earbuds in both ears, how would that impact his ability to hear the auditory cues, assuming he wasn't playing any music or had any sort of input through those earbuds?

A. Assuming that both ears had earbuds in, it would just be a global reduction in the sound transmission. So everything would be softened.

Q. And if he had some sort of auditory -- either a podcast or music playing through these earbuds, how would that impact his ability to hear the auditory cues?

A. So in addition to the . . . dampening or reduction of sound transmission from the external or sounds produced by the truck, there would also be masking created by anything being played on those -- through the earbuds. So it would be masking or interference that would help to hinder or provide a hindrance to his ability to hear those sounds.

The Defendants' expert even explained how Minott's testimony that he and Dayes had a conversation could be reconciled with Dayes having an earbud in his ear:

7

Q.    Now, can people be wearing earbuds, take them out to have a conversation with somebody, and then put them back in when they go -- when they're done having a conversation?  .  .  .  Is that something that you've experienced as a human factors scientist?

A.    Yes.

The jury's interest in this issue is evident by the fact that it asked the expert a question about the horn.[1]

Whether Minott sounded his horn was also a feature of the closing arguments. The Plaintiff, for its part, accused Minott of "telling an inconsistent story" about sounding his horn. In response, the Defendants made the earbuds a theme in their closing argument. After noting Dayes ignored the air horn, the Defendants asked rhetorically, "[Why] did he not hear it? Why? Because of the earbud? Who knows?" Later, again noting Dayes did not move out of the way of the truck even though Minott testified he honked his air horn, "How did an air horn not prompt that, unless he's got an earbud? I don't know. That's for you all to decide."

On the issue of liability and proximate cause, the first two questions on the verdict form were: (1) "Was there negligence on the part of Vincent Minott

---

[1] The jury asked, "Would duration of sound horn have made a difference for audible cues?" The expert answered that the duration would not have made a difference provided the horn sounded for at least a quarter of a tenth of a second.

which was a legal cause of the death of Harold Dayes? Yes or No. If your answer to question 1 is NO, your verdict is for the defendants, and you should not proceed further except to date and sign this verdict form . . . ." and (2) "Was there negligence on the part of Harold Dayes which was a legal cause of his death?" The jury answered "no" to the first question and did not reach the second question. After the post-trial motions were denied, this appeal followed.

## ANALYSIS

Mrs. Dayes raises four issues on appeal. We address and decide only one.[2] Mrs. Dayes argues the trial court erred by admitting Detective Morales's testimony that Sergeant Franks said Dayes had an earbud in his ear because this testimony was inadmissible hearsay.

The decision to admit evidence is reviewed under the abuse of discretion standard. See Simmons v. State, 934 So. 2d 1100, 1116 (Fla. 2006) ("A trial court has wide discretion concerning the admissibility of evidence and the range of subjects about which an expert can testify.").

---

[2] Among other things, Mrs. Dayes also appeals (1) the trial court's refusal to grant a mistrial after the Defendants' appeal to the jury's sympathy during voir dire and opening statements; (2) the trial court's decision to allow the Defendants to bolster Minott's testimony that he sounded the horn with a prior consistent statement; and (3) the trial court's refusal to grant a directed verdict after allowing the Defendants to place the Plaintiff's employer on the verdict form as a Fabre defendant. We do not reach these other issues.

"However, a '[trial] court's discretion is limited by the evidence code and applicable case law. A [trial] court's erroneous interpretation of these authorities is subject to de novo review.'" City of Miami v. Kho, 290 So. 3d 942, 944 (Fla. 3d DCA 2019) (quoting Bank of Am., N.A. v. Delgado, 166 So. 3d 857, 860 (Fla. 3d DCA 2015)).

Here, we assume, but do not decide, that Detective Morales was testifying as an expert on this point. The Florida Evidence Code addresses the extent to which an expert may testify to inadmissible facts that form the basis of an expert opinion:

> The facts or data upon which an expert bases an opinion or inference may be those perceived by, or made known to, the expert at or before the trial. If the facts or data are of a type reasonably relied upon by experts in the subject to support the opinion expressed, the facts or data need not be admissible in evidence. <u>Facts or data that are otherwise inadmissible may not be disclosed to the jury by the proponent of the opinion or inference</u> unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect.

Fla. Evid. Code § 90.704 (emphasis added).

While an expert may undoubtedly rely on hearsay in rendering opinions, "Florida courts have routinely recognized that an expert's testimony 'may not merely be used as a conduit for the introduction of the otherwise inadmissible evidence.'" Linn v. Fossum, 946 So. 2d 1032, 1037–38 (Fla.

10

2006) (quoting <u>Erwin v. Todd</u>, 699 So. 2d 275, 277 (Fla. 5th DCA 1997)). The reason for this rule is obvious: "[w]hen an expert's testimony acts as a conduit for inadmissible hearsay, the evidence is presented to the jury without affording the opposing party an opportunity to cross-examine and impeach the source of the hearsay." <u>Id.</u> at 1038 (citing <u>Gerber v. Iyengar</u>, 725 So. 2d 1181, 1185 (Fla. 3d DCA 1998)).

The rule and its rationale apply with particular force here. The other witnesses who saw Dayes on the ground either could not recall whether he had an earbud in his ear or did not testify to it. While there was evidence that Dayes had earbuds on his person, and Mrs. Dayes testified that he used earbuds for work purposes, the only evidence that Dayes had an earbud in his ear came from Detective Morales's relating what Sergeant Franks told him. However, according to quotations in the record from Sergeant Franks's own deposition, Franks himself could not recall whether or not Dayes had an earbud in his ear after the accident and he could not recall making a statement to that effect to Detective Morales. Thus, the result of allowing Detective Morales to testify as to what Sergeant Franks allegedly saw is that a "'highly impeachable statement . . . was presented for the jury's consumption without affording . . . an opportunity to cross-examine." <u>Id.</u>

(quoting Gerber, 725 So. 2d at 1185).[3] Even if Detective Morales was testifying as an expert, admission of this hearsay was error.

Nor do we believe the error of admitting this hearsay was harmless. The Supreme Court has held that error is harmless only when the beneficiary of the error demonstrates "there is no reasonable possibility that the error contributed to the verdict":

> As the appellate court evaluates whether the beneficiary of the error has satisfied its burden, the court's obligation is to focus on the effect of the error on the trier-of-fact and avoid engaging in an analysis that looks only to the result in order to determine harmless error. Could the admission of evidence that should have been excluded have contributed to the verdict? Could the exclusion of evidence that should have been admitted have contributed to the verdict? Unless the beneficiary of the error proves that there is no reasonable possibility that the error contributed to the verdict, the error is harmful.

Special v. W. Boca Med. Ctr., 160 So. 3d at 1256–57 (emphasis added).

---

[3] Alexander v. Penske Logistics, Inc., 867 So. 2d 418, 421 (Fla. 3d DCA 2003), cited by the Defendants, does not bear on the issue before us. Alexander held that the traffic report privilege under subsection 316.066(4), Florida Statutes (2002), did not prevent a traffic homicide investigator from testifying to an expert opinion he formed as part of his investigation because he had given the party making the statement a warning under Miranda v. Arizona, 384 U.S. 436 (1966). There is no discussion in Alexander whether the statement was admissible, which is the issue before us. Perhaps there was no discussion on this point because the party giving the statement was a defendant in the lawsuit.

The issue thus becomes whether the Defendants can prove there is no reasonable possibility that the admission of the hearsay that Dayes had an earbud in his ear contributed to the defense verdict. The Defendants contend this burden is met because the earbuds were only relevant to the issue of Dayes's comparative negligence and the jury never reached that issue because it found no negligence on the part of the Defendants. "What Sergeant Franks said about the earbud," the Defendants argue, "had nothing to do with the question of whether Mr. Minott was negligent in his operation of the truck."

While the testimony that Dayes had an earbud in his ear was obviously relevant to the issue of whether Dayes was comparatively negligent, it also bore on the credibility of Minott's version of events and therefore on the question of whether Minott was negligent. A major dispute at trial concerned whether Minott honked his horn before backing over Dayes. Three facts supported an inference that he did not: (1) the only independent witness to the accident did not hear the horn; (2) Dayes did not move to safety which he most likely would have done if he had heard the truck's horn; and (3) Minott was inconsistent regarding which of the truck's two horns he honked.

Among other things, the hearsay that Dayes had at least one earbud in his ear provided the Defendants a ready way to reconcile Minott's

13

testimony that he honked the horn with the fact that Dayes did nothing to heed the warning. The hearsay thus bolstered the Defendants' case in chief that they were not negligent. And the Defendants hammered on the earbuds in their direct examination of their expert, their driver, and during their closing argument. We must ask "[c]ould the admission of evidence that should have been excluded have contributed to the verdict?" Special, 160 So. 3d at 1256–57. In the facts of this case, quite clearly, it could have. For this reason, the Defendants are unable to meet their burden to prove "there is no reasonable possibility that the error contributed to the verdict" and we must find "the error is harmful." Id.

Reversed and remanded for new trial.