522 So.2d 410 (1988)
Linda K. PADDOCK, Appellant,
v.
Chawallur Devassey CHACKO, M.D., Appellee.
No. 86-916.
District Court of Appeal of Florida, Fifth District.
February 18, 1988.
Rehearing Denied March 30, 1988.
*411 Spence, Payne, Masington, Grossman & Needle, P.A., and Joel D. Eaton of Podhurst, Orseck, Parks, Josefsberg, Eaton, Meadow & Olin, P.A., Miami, for appellant.
E. Clay Parker and J. Scott Murphy, of Parker, Johnson, Owen & McGuire, and Harry K. Anderson, Orlando, for appellee.
ORFINGER, Judge.
On June 26, 1983, 35 year old Linda K. Paddock left the home of her parents with whom she had been temporarily residing, ran into a wooded area nearby, and set her clothes on fire with a cigarette lighter after superficially slashing her wrists with her knife. She sued the defendant, a psychiatrist whom she had seen professionally one time some four days earlier, alleging that his negligence proximately caused or contributed to her self-immolation, and after a lengthy trial, the jury awarded her $2,150,000 in damages.
The major thrust of the plaintiff's case centered around the failure of the defendant to hospitalize her and thus keep her from harming herself once her condition was known to him. Additionally, the plaintiff claimed that the defendant was negligent in prescribing an inadequate dosage of the antipsychotic drug Navane. The trial judge granted the defendant's motion for judgment notwithstanding the verdict, and alternatively granted defendant's motion for new trial.[1] Correctly noting that *412 the existence of a legal duty was a question of law for the court and not for the jury, the trial court determined that the law did not impose a legal duty on a psychiatrist to involuntarily take a patient into his custody; that he was not legally obligated (nor empowered) to take control of her life away from her against her will to protect her from her self-destructive tendencies. We agree that no such duty exists, and we affirm.
On June 6, 1983, the plaintiff attempted suicide in her North Carolina home by drinking a mixture of formaldehyde, protocaine, and liquor. She was taken to the hospital by her husband, where she stayed for two days. The treating physician (not a psychiatrist) diagnosed that her suicide attempt was caused by an episode of paranoid psychosis, and that she was mentally ill and at risk for another suicide attempt. The doctor recommended to the plaintiff's husband that she was in need of hospitalization or special psychiatric care and that he should immediately seek such care for her. At this time, the doctor prescribed four milligrams per day of an antipsychotic drug, Navane.
The plaintiff did not follow the doctor's advice to be hospitalized. Instead, the plaintiff's parents, Mr. and Mrs. Burkhart, drove to North Carolina, picked up their daughter and returned with her to their home in Orlando on June 12. Mr. Burkhart secured Dr. Chacko's name from another physician, called the office on June 15th, and made an appointment for his daughter to see the defendant on June 22, on which date the plaintiff and her father attended a session with Dr. Chacko. Dr. Chacko interviewed the plaintiff for approximately one-half hour alone, and when at Chacko's request she selected her father as the parent with whom the doctor should discuss her condition, Dr. Chacko spent an additional half-hour with her father. After the consultation, Dr. Chacko diagnosed her condition as a severe nervous breakdown from which she had substantially recovered. The plaintiff told Dr. Chacko that she expected to return to her home in North Carolina and he advised the plaintiff and her father that should she return to North Carolina she should seek immediate psychiatric care, but if she remained in Orlando, she could make an appointment with him.
The plaintiff returned to her parents' home after the interview. Because her parents had paid the $75.00 fee for the consultation with Dr. Chacko, she told them that he had helped her, although in fact, she did not feel any better. Later she spoke with her husband on the telephone and she asked him to come for her and take her back to North Carolina, but he would not or could not come for her. She then began to experience fears and anxiety and on Friday, June 22nd, she telephoned Dr. Chacko, with whom she was able to speak immediately. She told him that she was upset and confused and that she was very afraid and needed help. She informed him that she had not been as open with him during the Wednesday appointment as she could have been and that she was experiencing hallucinations. Dr. Chacko suggested hospitalization and Mrs. Paddock agreed that she would do whatever he recommended, but suggested that he first speak with her parents. Dr. Chacko then spoke with the plaintiff's mother about hospitalizing the plaintiff, but Mrs. Burkhart demurred, stating that Chacko would have to wait and speak with Mr. Burkhart about the possibility of hospitalizing the plaintiff because "he [the father] takes care of the business." The plaintiff was present with the mother during this conversation.
At this point, it is undisputed that Dr. Chacko called Orlando Regional Medical Center Psychiatric Service and reserved a bed for the plaintiff. Later in the afternoon, Mr. Burkhart returned home from work and spoke with Chacko on the telephone. Mr. Burkhart informed Chacko that the plaintiff was upset, that she was requesting additional help for her nerves, fears and hallucinations. When Chacko again recommended hospitalizing the plaintiff Mr. Burkhart told the doctor that his daughter had no insurance. The doctor suggested Orange County Medical Crisis Center which would admit the plaintiff without insurance. However, the father never gave his consent to hospitalizing the *413 plaintiff.[2] The doctor then prescribed an increased dosage of Navane and agreed that they could wait until Monday to see about admitting the plaintiff to the hospital. Dr. Chacko told Mr. Burkhart to contact his answering service if the plaintiff grew worse over the weekend because he would be out of town for the weekend. After the father finished speaking with Chacko, the plaintiff heard nothing more about going to the hospital and she did not ask about it herself. She testified that her father is a strong authority figure in her life and that "whatever he says, I do." The father testified that at this time, he did his best to help her, by rubbing alcohol on her arms and legs and talking with her to soothe her anxieties.
The following day, Saturday, the plaintiff appeared to her father to be in good spirits. On Sunday morning, June 26th, the father left the house for his usual round of golf, leaving the plaintiff at home with her mother. Before leaving, he spoke with his daughter and she informed him that she was upset and had been experiencing hallucinations during the night, but neither she nor her father attempted to contact Chacko. After her father's departure, the plaintiff began to experience feelings of fear and felt compelled to leave her home. She ran from the house into a wooded area nearby, took a knife from her purse and inflicted some superficial cuts on her wrists. She then took a cigarette lighter from her purse, and set her blouse on fire.
Four psychiatrists testified on plaintiff's behalf, essentially stating that plaintiff was at risk for suicide on June 24 when she telephoned Chacko and that Chacko's failure to hospitalize the plaintiff was a departure from the acceptable standard of care. Accepting this conclusion from a medical standpoint, it nevertheless overlooks the admitted fact that Chacko recommended hospitalization which recommendation was rejected. This raises the question then as to the extent, if any, of a psychiatrist's legal duty or legal authority to non-consensually take a patient into his custody and compel her hospitalization. We are not aware of any such duty or authority nor has any been suggested to us. There was testimony that the failure of the defendant to arrange a face-to-face interview with plaintiff was negligent because had he seen her he would have hospitalized her, where her risk of self harm would have been diminished, although not eliminated. However, since Chacko had already recommended hospitalization, we fail to see how an in person meeting would have changed anything. There was testimony that the increased dosage of Navane was inadequate, and thus a deviation from the standard of care, but there was no testimony that this failure, by itself, was a proximate cause of the plaintiff's injuries. All the medical witnesses agreed that even if hospitalized, there was no way to predict that plaintiff would not try to harm herself either in the hospital or after she was released. The sum and substance of plaintiff's medical testimony was that Chacko deviated from the acceptable standard of care by not hospitalizing the plaintiff and for leaving her in the care of her parents.
The practice of psychiatry has come a long way from the ancient practice of confining persons with aberrant behavior in institutions or asylums.[3] It has been recognized that mental illness may be caused or intensified by institutionalizing mental *414 patients.[4] The basic form of treatment in these asylums was based on restraint and immobilization. See O'Connor v. Donaldson, 422 U.S. 563, 582, 95 S.Ct. 2486, 2497, 45 L.Ed.2d 396 (1975) (Burger, C.J., concurring) ("The few states that established institutions for the mentally ill during this early period were concerned primarily with providing a more humane place of confinement and only secondarily with `curing' the persons sent there."). Emerging from these roots, the science and profession of psychiatry has burgeoned into a multifaceted social institution. The practice of psychiatry is no longer limited to the institutionalization of the mentally ill. Professionals in the practice of psychiatry and psychology now offer an innumerable variety of remedial therapies to the troubled and ailing souls of modern society. See generally Alternatives to Civil Commitment of the Mentally Ill: Practical Guides and Constitutional Imperatives, 70 Mich.L.Rev. 1107 (1972). We are impressed with Judge Jorgensen's observations in his dissenting opinion in Nesbitt v. Community Health of South Dade, Inc., 467 So.2d 711 (Fla. 3d DCA 1985) where, in a different factual context he noted that
The science of psychiatry represents the penultimate grey area. Numerous cases underscore the inability of psychiatric experts to predict, with any degree of precision, an individual's propensity to do violence to himself or others. See generally Annot., 17 A.L.R. 4th 1128, 1142 (1982); Annot., 6 A.L.R. 4th 1155, 1180 (1981); Annot., 38 A.L.R.3d 699, 704, 710 (1971). Indeed, "[p]sychiatrists themselves would be the first to admit that however desirable an infallible crystal ball might be, it is not among the tools of their profession." People v. Burnick, 14 Cal.3d 306, 326, 121 Cal. Rptr. 488, 501, 535 P.2d 352, 365 (1975). See In re Ballay, 482 F.2d 648, 665-66 (D.C. Cir.1973).
A substantial body of literature suggests that the psychiatric field cannot even agree on appropriate diagnosis, much less recommend a course of treatment. See generally 1 J. Ziskin, Coping with Psychiatric and Psychological Testimony (3d ed. 1981). [Footnote omitted].
467 So.2d at 717.
A psychiatrist, or any other doctor, may "order" his patient to comply with a prescribed treatment. When, however, the plaintiff speaks of her psychiatrist's duty to "order" hospitalization, it appears that something more is meant than the colloquial understanding of "doctor's orders." Essentially, the plaintiff argues that Chacko was obligated to demand and insure that his patient be hospitalized for the benefit of her own safety.
Dr. Chacko recommended hospitalization to the plaintiff's father but his suggestion was rebuffed due to a concern about insurance and because the father did not really believe that his daughter was in need of hospitalization. Although plaintiff was an adult, she had placed her care in her father's hands, and Chacko then offered the alternative of an increase in the dosage of medication and waiting before making further decisions concerning hospitalization. He made his telephone number available to the parents so they could contact him if the plaintiff's situation grew worse. Once Chacko offered this advice, there was nothing more he could have done, other than to forcibly take the plaintiff into custodial supervision.
One of plaintiff's experts testified that defendant was negligent for allowing himself to be dissuaded by plaintiff's father from hospitalizing the plaintiff, and offered as an alternative the opinion that Chacko should have caused plaintiff to be involuntarily hospitalized under the provisions of Florida's Baker Act. See § 394.451 et seq., Fla. Stat. (1985).[5] As the trial judge observed *415 in his order, the gravamen of the plaintiff's complaint was Chacko's failure to intervene in a crisis situation by taking the plaintiff into his custodial care. We are not prepared under the facts of this case to impose such a legal duty on a psychiatrist. The facts show clearly that the plaintiff had already surrendered herself to the custody of her father and was willing to do whatever he directed. Chacko had advised the father of the need for the plaintiff's hospitalization but this advice was rejected. Chacko made his phone number available to the parents who could contact him at any time, although this was never done. The language of the Baker Act statute is permissive and suggests no basis for imposing an affirmative obligation on psychiatrists or other mental health professionals. Cf. Fischer v. Metcalf, 12 F.L.W. 2846 (Fla. 3d DCA Dec. 15, 1987) (penal statute requiring physicians and other specified persons to report knowledge of patient's child abuse creates civil cause of action against persons failing to comply with provision).[6] This court has already held that a defendant may be liable for malicious prosecution for commencing a civil proceeding resulting in an involuntary detention and examination. See Pellegrini v. Winter, 476 So.2d 1363 (Fla. 5th DCA 1985). We decline to force every psychiatrist to navigate between Scylla and Charybdis, in deciding whether or not to involuntarily detain and examine a patient.[7] To impose liability on Dr. Chacko for his failure to involuntarily detain the plaintiff for examination, where she was already under the care and custody of her parents, who had refused his advice for hospitalization, would create an intolerable burden on psychiatrists and the practice of psychiatry.
We have carefully considered the case law submitted by the plaintiff in support of her arguments. See, e.g., Annot., Liability of Doctor, Psychiatrist, or Psychologist for Failure to Take Steps to Prevent Patient's Suicide, 17 A.L.R. 4th 1128 (1982). These authorities actually support our holding that a psychiatrist has no duty to assume custodial care over his patient. There is some precedent in Florida law for liability predicated upon the negligent failure to safeguard and protect a psychiatric patient with suicidal tendencies. See Robison v. Faine, 12 F.L.W. 2863 (Fla. 3d DCA Dec. 15, 1987); Nesbitt v. Community Health of South Dade, Inc., supra; North Miami General Hospital v. Krakower, 393 So.2d 57 (Fla. 3d DCA 1981); Dillmann v. Hellman, 283 So.2d 388 (Fla. 2d DCA 1973). However, in each of these cases, the patients were already committed to the custody of a *416 hospital or mental institution. These patients had surrendered themselves to the care of others and thus these custodians were in a position to exercise measures to prevent the suicidal patients from inflicting injuries upon themselves. In this case, as long as the plaintiff's father and mother exercised control over the plaintiff, Chacko was not in a position to do anything, other than offer his professional advice as to what methods of treatment were most suitable to his patient's needs.
Cases from other jurisdictions are consistent with this reasoning. It has been recognized as a general rule that there is no liability for the suicide of another in the absence of a specific duty of care. See Annot., Liability for Suicide, 11 A.L.R.2d 751 (1950). As an exception to this general rule, it is well established that a hospital or sanatorium owes its patients or inmates a specific duty of care. See Annot. Hospital's Liability for Mentally Deranged Patients' Self-Inflicted Injuries, 36 A.L.R. 4th 117 (1985). If that duty is breached and as a result of such breach, the patient commits suicide or inflicts injury upon himself, the institution is liable. DeMontiney v. Desert Manor Convolescent Center, 144 Ariz. 6, 695 P.2d 255 (1985). The duty is based solely on the fact of the patient's confinement in the hospital, and the hospital's ability to supervise, monitor and restrain the patient. See Katona v. County of Los Angeles, 172 Cal. App.3d 53, 218 Cal. Rptr. 19, 22 (1985) ("Because of hospital's duty to supervise and protect its patients, a wrongful death action will lie where a defendant committed suicide while undergoing psychiatric treatment and while confined to a hospital"). Upon release of the patient, this duty ceases.[8]See Katona, supra (County mental health facility had no duty to supervise and protect a suicidal patient once she had been released); Paradies v. Benedictine Hospital, 77 A.D.2d 757, 431 N.Y.S.2d 175 (1980) (Mental hospital under no duty to involuntarily commit patient once he had been released); Harland v. State, 75 Cal. App.3d 475, 142 Cal. Rptr. 201 (1977) (State Veteran's hospital was not liable when one of its residents was permitted to drive an automobile and while doing so, struck and killed and severely injured plaintiffs; plaintiffs argued that the hospital had a duty to prevent the patient from driving, however, court held that "No lawful basis has been shown for the exercise for such paternalistic powers over a citizen in the absence of an adjudication of incompetency"); Runyon v. Reid, 510 P.2d 943 (Okl. 1973) (Summary judgment affirmed in favor of psychiatric hospital affirmed where decedent committed suicide while an out-patient). Several cases have recognized the distinction between the doctor's professional duty to treat and diagnose his patient, and the hospital's duty to protect and restrain the patient. In New York, the psychiatrist's decision to release a patient from a mental hospital is a matter of professional medical judgment for which liability cannot attach. Centeno v. City of New York, 48 A.D.2d 812, 369 N.Y.S.2d 710, affirmed, 40 N.Y.2d 932, 389 N.Y.S.2d 837, 358 N.E.2d 520 (1975); Paradies, supra. However, a hospital's negligence in the supervision and care of a suicidal patient is actionable. Huntley v. State, 62 N.Y.2d 134, 476 N.Y.S.2d 99, 464 N.E.2d 467 (1984); Gunnarson v. State, 95 A.D.2d 797, 463 N.Y.S.2d 853 (1983). In Indiana, the law recognizes the distinction between the psychiatrist's duties of diagnosis and treatment, which are considered "medical acts" and the hospital's duties of care, protection and customary hospitalization, as "ministerial" or "administrative acts." See Fowler v. Norways Sanatorium, 112 Ind. App. 347, 42 N.E.2d 415 (1942). The Washington Supreme Court has held that the decision of whether self-destructive patients are to be placed in an open ward or physically restrained is a matter of medical judgment with which the courts should not interfere. However, the failure of hospital *417 staffs to implement the orders of a patient's attending psychiatrist give rise to liability for the patient's self-inflicted injuries. See Adams v. State, 71 Wash.2d 414, 429 P.2d 109, 114-15 (1967). Other courts have also held that a hospital's standard of care for the supervision and treatment of suicidal patients is not a question involving medical judgment or expertise. See Meier v. Ross General Hospital, 69 Cal.2d 240, 71 Cal. Rptr. 903, 445 P.2d 519 (1968) (Where evidence showed than an open window was not inextricably connected with a course of treatment involving the exercise of medical judgment, jury may find that defendant doctor and hospital breached duty of care, even in absence of expert testimony); Maricopa County v. Cowart, 106 Ariz. 69, 471 P.2d 265 (1970) (Plaintiff failed to establish evidence of standard of care required in supervising inmates in a juvenile detention home); Payne v. Milwaukee Sanitarium Foundation, Inc., 81 Wis.2d 264, 260 N.W.2d 386 (1977) (Duty of care of hospital in treating mental patient depends on type of negligent acts involved).
The principle underlying all of these cases is the same. Where a patient has surrendered himself to the custody, care and treatment of a psychiatric hospital and its staff, liability may be predicated upon the hospital's failure to take protective measures to prevent the patient from injuring himself. We have found no case that has held a doctor liable for the failure to take his patient into custody.[9] Under the circumstances and facts of this case, we are unwilling to extend the duty of custodial supervision and care to the out-patient relationship between a psychiatrist and a patient.
The experts also testified that Chacko was negligent for failing to arrange for a face-to-face examination of his patient. However, the testimony as to whether this breach of duty caused the plaintiff's injuries is purely speculative. One expert testified that if Chacko had seen the plaintiff, he would have been "confronted with reality and the extent of her psychosis" and would have taken appropriate protective measures. On cross-examination however, when asked to elaborate on this point, the experts stated that "[a] lot depends on what conclusions he would have come to under these circumstances when viewed in the context of other information that could be available." No expert was able to testify just what protective measures could have been taken by Chacko if he had examined the plaintiff. It seems clear that if he had examined the plaintiff, he could have only recommended hospitalization, which he had already done on the telephone. In this case, we find as a matter of law that Chacko's failure to visit the plaintiff was not a proximate cause of her self-inflicted injuries. Finally, although several experts testified that Chacko was negligent in his prescription of the anti-psychotic drug, no expert testified that the plaintiff more likely than not would have overcome her suicidal tendencies with a different prescription. See Gooding v. University Hospital Building, Inc., 445 So.2d 1015 (Fla. 1984) (In a medical malpractice case, plaintiff must offer evidence that more likely than not injury would not have resulted for the doctor's negligence).
In summary, we find that Chacko had no duty to take the plaintiff into his custody to prevent her from inflicting injury upon herself. Also, Chacko's failure to arrange for *418 a face-to-face examination or to prescribe proper amounts of anti-psychotic drugs, was not shown to be a proximate cause of the plaintiff's self-inflicted injuries. The trial court was thus correct in entering a JNOV and vacating the jury's award of damages to the plaintiff.
AFFIRMED.
DAUKSCH and COBB, JJ., concur.
NOTES
[1] One basis for the alternative order granting new trial was "Irregularities in the Jury Deliberations." During the trial, a note was left on the windshield of the jury foreman disclosing a settlement between the plaintiff and her parents. Following a court ordered jury interview after trial, the trial court concluded that this note had influenced the foreman in favor of plaintiff and that the foreman's attitude significantly affected the jury in its deliberations. As an additional reason, the court noted that two letters from plaintiff's husband were improperly delivered to the jury during its deliberations. "They were not in evidence, and they were clearly inadmissible and prejudicial to the defendant. To some extent these letters discussed the mental condition of the plaintiff, and also the financial plight of the Paddocks." Because of our conclusion that the entry of a judgment NOV was correct, we need not discuss these issues further.
[2] At trial, the father testified that he did not think Linda needed to be hospitalized when he talked to Dr. Chacko. In a written statement by the plaintiff approximately two months after the incident and read to the jury at trial, she said that after her father spoke with Dr. Chacko, he told her that they could handle the situation by themselves and he did not think it necessary for her to go to the hospital.
[3] The American psychiatric profession originated with the founding of the Association of Medical Superintendents of American Institutions for the Insane, established in 1844 by 13 medical superintendents of mental hospitals. In 1921 this organization became the American Psychiatric Association. See the introduction to Ennis, Prisoners of Psychiatry (1972). For a thorough discussion of the development of the mental institution, see Saphire, The Civilly-Committed Public Mental Patient and the Right to Aftercare, 4 Fla.State.L.Rev. 232, 238 (1976).
[4] 4 Fla.State L.Rev. at 293, 294, quoting Yolles, Mental Health's Homeostatic State: A New Territory, 7 Int'l.J.Psychiatry 327-28 (1969).
[5] Section 394.463, Florida Statutes, authorizes an involuntary examination under certain limited circumstances:

(1) CRITERIA.  A person may be taken to a receiving facility for involuntary examination if there is reason to believe that he is mentally ill and because of his mental illness:
(a) 1. He has refused voluntary examination after conscientious explanation and disclosure of the purpose of the examination; or 2. He is unable to determine for himself whether examination is necessary; and
(b)1. Without care or treatment, he is likely to suffer from neglect or refuse to care for himself; such neglect or refusal poses a real and present threat of substantial harm to his well-being; and it is not apparent that such harm may be avoided through the help of willing family members or friends or the provision of other services; or
2. There is a substantial likelihood that without care or treatment he will cause serious bodily harm to himself or others in the near future, as evidenced by recent behavior.
* * * * * *
3. A physician, psychologist licensed pursuant to chapter 490, psychiatric nurse, or clinical social worker may execute a certificate stating that he has examined a person within the preceding 48 hours and finds that the person appears to meet the criteria for involuntary examination and stating the observations upon which that conclusion is based. If other less restrictive means are not available, such as voluntary appearance for out-patient evaluation, a law enforcement officer shall take the person named in the certificate into custody and deliver him to the nearest available receiving facility for involuntary examination. The law enforcement officer shall execute a written report detailing the circumstances under which the person was taken into custody. The report and certificate shall be made a part of the patient's clinical record.
§ 394.463, Fla. Stat. (1985). Section 394.467 specifies the procedures for involuntary commitment under similar circumstances. A patient may be involuntarily placed for treatment after notice and hearing and the need for such treatment must be supported by the opinions of two psychiatrists or clinical psychologists. No expert testified that the plaintiff should have been involuntarily placed in a treatment facility.
[6] The Florida Legislature has expressed a public policy of employing the least restrictive means of intervention in the provision of mental health care. See § 394.453(1)(a), Fla. Stat. (1985).
[7] "Incidit in Scyllam qui vult vitare Charybdim." This latin proverb means that in our eagerness to avoid one evil, we often fall into greater.
[8] Cf. Nesbitt v. Community Health of South Dade, Inc., supra, where the court held that liability could be predicated upon the allegation that the defendant released the decedent from the hospital when they knew or should have known that he was suffering from a severe mental disturbance which rendered him helpless to care for himself.
[9] Dictum in two cases submitted by the plaintiff suggests such a duty. However, the holdings and results of these opinions do not support the plaintiff's position. In Bellah v. Greenson, 81 Cal. App.3d 614, 146 Cal. Rptr. 535 (1978), the court affirmed the dismissal of a plaintiff's complaint on the grounds of a statute of limitations defense and in doing so, gratuitously discussed the plaintiff's theory of liability against the defendant psychiatrist. In Stepakoff v. Kantar, 393 Mass. 836, 473 N.E.2d 1131 (1985), the court affirmed the jury's verdict finding the defendant psychiatrist not liable for the wrongful death of a suicidal patient. Here, the patient was not in the custodial care of the psychiatrist. The court refused to accept the plaintiff's argument that the jury should have been instructed that the psychiatrist was required to take reasonable steps to protect the plaintiff from her self-destructive tendencies. We find neither of these cases supportive of the plaintiff's argument that a psychiatrist has an affirmative duty to involuntarily take a patient into his custody when she has rejected his advice that she be hospitalized.