909 So.2d 371 (2005)
MENTAL HEALTH CARE, INC., a/k/a Baylife Centers of Tampa Bay, Appellant,
v.
Karen STUART, n/k/a Karen Stuart-Conley, Appellee.
No. 2D04-2742.
District Court of Appeal of Florida, Second District.
August 3, 2005.
Scot E. Samis of Abbey, Adams, Byelick, Kiernan, Mueller & Lancaster, L.L.P., St. Petersburg, for Appellant.
Raymond T. Elligett, Jr., and Amy S. Farrior of Schropp, Buell & Elligett, P.A., Tampa; and Timothy G. Anderson and Leslie Longshore of Timothy G. Anderson, P.A., Tampa, for Appellee.
ALTENBERND, Judge.
Mental Health Care, Inc. (MHC), appeals a final judgment in favor of Karen Stuart, n/k/a Karen StuartConley, in a personal injury lawsuit. We reverse the judgment. We hold that a case manager at a community mental health facility who has provided non-custodial mental health care for a client has no duty to warn the nursing staff at a psychiatric hospital that the client may be dangerous when the client is admitted to the hospital as a result of a Baker Act proceeding initiated by a third party.
*372 Michael Cox is a paranoid schizophrenic. He began receiving outpatient counseling in the early 1990s from MHC, a government-funded community mental health facility that provides a broad array of services, primarily to low- or no-income patients. Prior to and during his relationship with MHC, Mr. Cox had been hospitalized and involuntarily committed on multiple occasions.
In 1995, MHC assigned Mr. Cox to a clinical case manager, Ms. Perkins. She had a bachelor's degree in psychology and provided basic mental health services for some of MHC's clients.[1] Ms. Perkins' responsibilities as Mr. Cox's clinical case manager included helping Mr. Cox avoid future involuntary commitment by counseling him on behaviors such as personal hygiene and helping him establish personal goals such as obtaining a GED, living independently, and avoiding substance abuse. Ms. Perkins met with Mr. Cox several times a week, both at MHC and at his home where he lived with his mother. Although Ms. Perkins testified that Mr. Cox was less delusional and easier to deal with than some of her other patients and that she was never afraid of him during any of their interactions, Mr. Cox did have a history of violent outbursts against staff members, other patients, and even a police officer. Mr. Cox also talked about harming himself and others.
On October 17, 1995, Mr. Cox attempted suicide by overdosing on Clozaril, a prescription medication he took for his schizophrenia.[2] This suicide attempt took place at his mother's home. Mr. Cox was taken to Brandon Hospital where he was treated on an emergency basis. Brandon Hospital's records indicate that Mr. Cox was aggressive, suffering from visual and/or auditory hallucinations, threatening to kill anyone who touched him, and that he had to be placed in four-point restraints. An attending physician at Brandon Hospital initiated proceedings under the Baker Act.[3]
Brandon Hospital does not have a psychiatric unit. As a result, a case manager at that hospital contacted Ms. Perkins and requested her assistance in making arrangements to have Mr. Cox transferred to a mental health facility. It is unclear from the record whether Ms. Perkins had a legal responsibility to assist in this transfer, but it is undisputed that she provided the necessary assistance. Ms. Perkins recommended transferring Mr. Cox to Charter Hospital because Mr. Cox could be seen there by an MHC psychiatrist who had privileges at Charter and who dealt with patients similar to Mr. Cox. Ms. Perkins contacted Charter Hospital by phone and explained that Mr. Cox had overdosed, asked if Charter Hospital would accept him, and asked if Charter Hospital needed her to prepare paperwork for the transfer. Ms. Perkins did not mention anything regarding Mr. Cox's patient history.
The Brandon Hospital physician who initiated the Baker Act proceeding for Mr. Cox also called Charter Hospital and *373 spoke with the MHC physician who would be receiving Mr. Cox. While the Brandon Hospital physician informed the receiving doctor of Mr. Cox's overdose, he did not inform her about Mr. Cox's violent and erratic behavior while he was at Brandon Hospital.
On October 19, Brandon Hospital transferred Mr. Cox to Charter Hospital with a "precaution level B," stating that the "client has history of aggressive behavior against self or others with no recent negative behavior displayed during client observation period. Client appears to be cooperative." Upon his arrival, Mr. Cox was evaluated by a psychiatric nurse who noted that Mr. Cox was "sad, hostile, irritable, defensive," and described his behavior as being "repetitive movements, agitated, repulsive, avoids eye contact, restless and anxious." The Charter Hospital report also indicated that Mr. Cox had spent a year and eight months in a state hospital and had long-term psychiatric problems. Mr. Cox was then placed in an intensive care unit.
Ms. Conley was a psychiatric nurse at Charter Hospital. When she arrived on October 20 for her shift in the intensive care unit, she learned that Mr. Cox had been newly admitted, that he was a schizophrenic who had overdosed on his medicine, and that he had been transferred to her facility as a result of the Baker Act proceeding initiated by the physician at Brandon Hospital.
While on duty on October 20, Ms. Conley noticed Mr. Cox becoming restless and agitated. He became even more so when Ms. Conley refused to let him leave the locked unit to smoke a cigarette. Ms. Conley sought the assistance of two male staff members to help her calm Mr. Cox. He began cursing at her and making gestures with his arms and hands. Ms. Conley suggested Mr. Cox have a "time-out" in seclusion, gave him an anti-anxiety medication, and escorted him down the hall with the help of the two male orderlies. Despite the presence of the male orderlies, as Ms. Conley turned to remove a chair from the hallway, Mr. Cox struck her on the back of her head with his fists. As a result of this attack, Ms. Conley apparently suffered a moderate degree of brain damage that affected her eyesight to the extent that she was forced to relinquish her driver's license.
Following this incident, Ms. Conley filed a seven-count complaint against various individuals and entities, including MHC, on the theory that she was not adequately warned of or protected from Mr. Cox.[4] Prior to trial, the claims against all of the named defendants, except MHC, were settled or dismissed.[5] However, two of the defendants as well as Charter Hospital were placed on the verdict form as Fabre *374 defendants. See Fabre v. Marin, 623 So.2d 1182 (Fla.1993).
Ms. Conley claimed that MHC was vicariously liable for Ms. Perkins' failure to inform personnel at Charter Hospital of Mr. Cox's potential for violence.[6] At the conclusion of the trial, after the denial of MHC's motion for directed verdict, the jury returned a verdict finding MHC liable for Ms. Perkins' negligent failure to warn and awarding damages totaling $901,415.72 to Ms. Conley for her injuries. The jury placed no comparative negligence on Ms. Conley and placed no responsibility upon any of the Fabre defendants.
The dispositive issue in this case is whether a case manager at a community mental health facility providing services to a non-custodial client owes a duty to warn a hospital that the client is potentially dangerous at the time the client is admitted as a psychiatric patient.[7] This issue, which concerns an attempt to create liability for the alleged negligence of an unlicensed, para-professional employee, may be one of first impression in Florida, but the reasoning supporting our decision is well established. In Boynton v. Burglass, 590 So.2d 446 (Fla. 3d DCA 1991), the Third District refused to establish a similar duty to warn for a psychiatrist, holding that not only did a psychiatrist who was treating a voluntary outpatient not have the right or ability to control the patient's behavior, but also that it was improper to transform the duty to control into a duty to warn. Id. at 449. The reasoning for this holding, which we adopt today, stems from the inherent unpredictability associated with mental illnesses and the "near-impossibility of accurately or reliably predicting dangerousness." Id. at 450 (citing Hasenei v. United States, 541 F.Supp. 999, 1011 (D.Md.1982)). The court in Boynton aptly stated,
To impose a duty to warn or protect third parties would require the psychiatrist to foresee a harm which may or may not be foreseeable, depending on the clarity of his crystal ball. Because of the inherent difficulties psychiatrists face in predicting a patient's dangerousness, psychiatrists cannot be charged with accurately making those predictions and with sharing those predictions with others.
Id. This court extended the reasoning in Boynton to apply in a case in which a patient made statements to a mental health worker that constituted a serious threat of violence to the victim. See Green v. Ross, 691 So.2d 542 (Fla. 2d DCA 1997). Other courts have reached similar results. See, e.g., Charleston v. Larson, 297 Ill.App.3d 540, 231 Ill.Dec. 497, 696 N.E.2d 793 (1998); Thapar v. Zezulka, 994 S.W.2d 635 (Tex.1999).
We see no basis not to apply the reasoning of Boynton and Green in this case. If anything, this outcome seems more obvious when the alleged tortfeasor is merely a case manager and not a licensed psychiatrist and when the entity to be warned is not an ordinary citizen, but a psychiatric *375 hospital accepting a patient under the Baker Act. Accordingly, we reverse the judgment and remand for entry of judgment in favor of MHC.
Reversed and remanded.
STRINGER and DAVIS, JJ., Concur.
NOTES
[1] The record does not suggest that Ms. Perkins was licensed or required to be licensed to work as a case manager. She was not a "mental health counselor," which requires a master's degree and is the first level of counselor licensed and regulated in Florida. See § 491.003(6), .005(4), Fla. Stat. (Supp.1994). No one argues in this case that the relevant service provided by Ms. Perkins should have been performed by a licensed practitioner.
[2] Ms. Perkins, of course, did not prescribe this medication. It was prescribed by a staff physician at MHC. Apparently, it is difficult to establish a proper dosage for this medication. When Ms. Perkins visited Mr. Cox, she did attempt to assess whether the dosage was proper.
[3] See § 394.451 et seq., Fla. Stat. (1995).
[4] The defendants included the MHC psychiatrist who agreed to see Mr. Cox at Charter Hospital, the Brandon Hospital physician who initiated the Baker Act proceeding, Brandon Hospital, and Transcare, which owns and operates the vehicle used to transport Mr. Cox from Brandon Hospital to Charter Hospital. The defendants did not include Michael Cox, Charter Hospital, or any of Charter Hospital's employees. Because Ms. Conley sustained an on-the-job injury, any claims against Charter Hospital or her co-workers would presumably have been barred by workers' compensation immunity. See § 440.11, Fla. Stat. (1995).
[5] Ms. Conley's complaint contained two counts of vicarious liability against MHC. One alleged the negligence of Ms. Perkins, and the other claimed that the psychiatrist at MHC who agreed to see Mr. Cox at Charter was also negligent. MHC received a directed verdict on the count concerning the doctor, leaving the claim involving Ms. Perkins as the sole remaining basis for MHC's liability.
[6] The jury did not receive special jury instructions on this theory. Instead, they were told that the issue for their determination was "whether Mental Health Care, Inc., through its employee, [Ms.] Perkins, was negligent." They received the standard instruction on the definition of negligence.
[7] The duty to warn in this case would presumably involve a duty to warn the hospital's admittance staff, who in turn would warn the nursing staff. Ms. Conley maintains that she would have taken steps to avoid Mr. Cox's attack if the hospital chart had noted a warning from Ms. Perkins. This theory obviously presents difficult questions of proximate or legal causation. In light of our holding in this opinion, we do not decide any issue of causation. We also note that our decision does not require us to reach the separate issue of whether the verdict was contrary to the manifest weight of the evidence when it placed all responsibility for these injuries on MHC.