[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
DECEMBER 1, 2009
THOMAS K. KAHN
CLERK

No. 09-12351
Non-Argument Calendar
_____

D.C. Docket No. 07-01297-CV-T-MAP

LORI ANN TIMSON, as personal representative of the
Estate of Truoc Thanh Tran, deceased, on behalf of the
Estate and on behalf of the survivors, T.T.T., a minor,
T.T.T., a minor, and T.T.V.T., a minor,

Plaintiff-Appellant,

versus

JUVENILE AND JAIL FACILITY MANAGEMENT
SERVICES, INC., a foreign corporation doing business
in the State of Florida doing business as Corrections
Corporation of America,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(December 1, 2009)

Before EDMONDSON, BIRCH and COX, Circuit Judges.

PER CURIAM:

In her capacity as the personal representative for the estate of Truoc Thanh Tran ("Tran"), the Plaintiff filed a wrongful death action against the Defendant, the Corrections Corporation of America ("CCA"). CCA managed the Hernando County Jail in Florida, where Tran was incarcerated. The Plaintiff originally filed her complaint in the Circuit Court of the Fifth Judicial Circuit of Hernando County, Florida, but CCA removed it to the United States District Court for the Middle District of Florida as a diversity action.

The complaint alleged that CCA was negligent, in that it breached its duty of reasonable care over inmate safety, and as a result, Tran committed suicide. The district court granted CCA's motion for summary judgment, finding that it was not reasonably foreseeable that Tran would commit suicide. The Plaintiff appeals.

In order to prove a prima facie claim of negligence in Florida, a plaintiff must establish four elements: (1) that a defendant owed a duty or obligation to conform to a standard of conduct for the protection of others; (2) that the defendant breached its duty; (3) "a reasonably close causal connection between the nonconforming conduct and the resulting injury to the claimant"; (4) actual harm on the plaintiff. *Williams v. Davis*, 974 So. 2d 1052, 1056 (Fla. 2007) (quotations and citations omitted).

While corrections officers in Florida owe inmates a duty to use reasonable care in ensuring their safety,

2

[s]elf-infliction of injury. . . is treated as an independent intervening cause, which may suffice to break the causal connection between the conduct of the corrections officer and any injury sustained by the inmate. However, causation is *not* defeated, and the officer is not relieved of liability, if the intervening cause was foreseeable or reasonably might have been foreseen by the wrongdoer. Thus, in suicide cases, Florida courts have treated as the key inquiry whether it was reasonably foreseeable that harm would befall the inmate either directly or indirectly as a result of the actions and omissions of the corrections officers.

*Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Fla.*, 402 F.3d 1092, 1120 (11th Cir. 2005).

The question we must answer in this case is whether the Plaintiff presented evidence sufficient to satisfy the proximate cause element of this negligence claim. The district court acknowledged that when a question about the foreseeability of an intervening cause arises, generally that question should be left for the jury. "Florida's courts have repeatedly stressed that this basic question is not one for the court to answer as a matter of law, but rather is properly left to the trier of fact for resolution." *Id.* (citations omitted). Nevertheless, although the "evidentiary threshold for sending this claim to the jury is low," *id.*, a judge may remove the question from the jury if there is "*a total absence of evidence* to support an inference that the intervening cause was foreseeable." *Id.* (*citing Overby v. Willie*, 411 So. 2d 1331, 1332 (Fla. 4th DCA 1982); *see also Moore v. Morris*, 475 So. 2d 666, 668 (Fla. 1985) (finding that

3

summary judgment in a negligence suit "should not be granted unless the facts are so crystallized that nothing remains but questions of law.") The evidence in this case does not support a finding that Tran's suicide was reasonably foreseeable by CCA or its employees.

As the district court noted,

> [i]n determining the foreseeability of inmate suicide, Florida courts focus on the information reasonably available to the jailor. That information includes observations of the detainee's conduct or a detainee's history of mental illness or suggestive behavior. At a minimum, there must be some indicia presented that puts the custodian on notice that the detainee may present a risk to himself."

(R.1-51 at 10.) Unlike in *Overby*; *Hutchison v. Miller*, 548 So. 2d 883 (Fla. 5th DCA 1989); *Schmelz v. Sheriff of Monroe County*, 624 So. 2d 298 (Fla. 3rd DCA 1993); or *Cook*, in this case there was simply no information reasonably available to CCA indicating that Tran would commit suicide.

In all of the aforementioned cases, courts held, in essence, that enough information was reasonably available to the jailors to constitute a jury question on the issue of foreseeability of the inmate harming himself. In *Overby*, (1) the inmate requested to be taken to a mental health center; (2) he had become violent during the booking process; and (3) jail employees had designated him as being emotionally unstable. *Overby*, 411 So. 2d at 1333. Similarly, in *Hutchison*, the fifteen-year-old

4

inmate was the subject of harassment, threats, and sexual abuse from other inmates. As a result, he was frightened and made repeated requests to be transferred to another cell. The inmate was repeatedly seen crying in the corner of his cell. *See Hutchison*, 548 So. 2d at 884-85. Although the inmate's behavior in *Schmelz* was not as striking as in *Overby* or *Hutchison*, in that case the jailor knew the inmate from previous incarcerations, and believed that he was depressed and may "try to do something." Consequently, the jail placed the inmate on suicide watch. *Schmelz*, 624 So. 2d at 299. Additionally, another jailer observed the inmate as flustered, nervous, and worried. *Id.* Finally, in *Cook*, the inmate made two written requests to see a psychiatrist, one of which stated that he needed to see a psychiatrist "as soon as possible" because he was "mentally sick." *Cook*, 402 F.3d at 1122. Moreover, officers observed the inmate as being anxious and nervous, and apparently having an anxiety attack.

In contrast to these cases where there was information reasonably available to jail officials that the inmate may harm himself, in this case the district court concluded that "nothing in [the] record indicates [CCA's] employees had witnessed or had knowledge of any mental issues or suicidal tendencies or behaviors on the part of Tran." (R.1-51 at 14.) We agree. While Tran was being booked into the Hernando County Jail, CCA employees completed a mental health screening form on

5

him. Nothing in the screening form indicated that Tran had any mental health problems. During his incarceration, Tran made two sick call requests. Both complained of insomnia, which he stated he had suffered from since he was a teenager.

Tran had phone conversations with his fiancé suggesting he may harm himself. But his fiancé never brought this information to the attention of CCA officials. Although all phone conversations were recorded, recorded calls are not monitored by prison officials. Importantly, as the district court pointed out, nothing in the Florida Model Jail Standards requires prisons to monitor prisoner phone calls. Tran also made statements to his cell-mate, Quang Tran ("Quang"), that he may commit suicide. However, Quang never informed any CCA employees of this. At some point, Quang "attempted" to speak with a guard about Tran's suicidal tendencies, but the guard stated she was in the middle of a count when he tried to get her attention. Nothing in the record indicates that the guard knew what Quang wanted to discuss, and Quang never followed up with the guard.

The night before Tran committed suicide, Quang moved his belongings to a different cell. During the move, Quang spoke briefly with a CCA official. Although there is a question of whether CCA violated its own policies in the manner in which it allowed Quang to change cells, nothing in the record indicates that Quang told the

6

official he conversed with, while moving his belongings, of Tran's intention to commit suicide. The next morning, Tran took his own life. Florida Model Jail Standards require prison officials to perform visual checks on inmates every hour. However, CCA has a stricter policy, which requires checks every thirty minutes. In spite of this policy, during the morning of Tran's suicide, guards performed checks only hourly, including one check which omitted the location where Tran was found. Contrary to the contentions of the Plaintiff, none of these facts made Tran's suicide reasonably foreseeable to CCA officials.

We agree with the district court that this case is unlike *Overby*, *Hutchison*, *Schmelz*, and *Cook*, and instead is more analogous to *Guice v. Enfinger*, 389 So. 2d 270 (Fla. 1st DCA 1980). In *Guice,* the court upheld summary judgment for the sheriff, holding that the inmate's suicide was not foreseeable. Therefore, the sheriff was not liable for failing to remove the inmate's belt, which the inmate used to hang himself. *Id.* at 271. Like that case, nothing in the record before us indicates that employees of CCA "should have been suspicious of" Tran's suicidal tendencies. *Id.* Accordingly, the district court did not err in holding that "reasonable minds could not differ as to the foreseeability of Tran's suicide." (R.1-51 at 24-25.)

AFFIRMED.

7