EMAS, J.
Consuelo Kelley (“Kelley”) appeals an order granting final summary judgment in favor of Beverly Hills Club Apartments, LLC, a/k/a Aventura Harbor Apartments and Beverly Hills Club Apartments Management, Inc. (collectively, “Beverly Hills Club”). We affirm, holding the trial court was correct in concluding that, as a matter of law, Beverly Hills Club did not owe a duty to Kelley.

FACTS AND PROCEDURAL BACKGROUND

Beverly Hills Club owns and operates a rental apartment community in Miami-Dade County. Extended Care Treatment, Inc. (“Transitions”) provides addiction and mental health treatment to clients at its corporate facility. In 2004, Beverly Hills Club entered into a rental agreement with Transitions.[1] Through that agreement, Transitions rented several units and placed some of its residential clients, including Kelley, in the Beverly Hills Club apartments.
Two Transitions staff employees reside at Beverly Hills Club and are responsible for supervising the clients who live there. The staff maintains contact with the clients throughout the day and conducts rounds during the night to check on them. The staff also deals with any day-to-day maintenance issues, including repairs that are needed for the rented apartments.[2] Transitions does not provide Beverly Hills Club with a list of clients residing in the com *956 plex. Although Beverly Hills Club is generally aware of the treatment provided by Transitions, it is not given specific medical information about any of the Transitions clients who reside at the complex. The clients do not wear a uniform or any distinctive clothing that would identify them as Transitions’ clients. Transitions does not notify Beverly Hills Club of any clients with suicidal tendencies because to do so would violate doctor-patient confidentiality. Beverly Hills Club therefore does not know which residents are clients of Transitions, nor does it know the type of treatment provided to each Transitions client.
In January 2005, Kelley voluntarily admitted herself to Transitions for treatment. Transitions assigned her to Apartment 416 of the Beverly Hills Club complex. According to Kelley, on March 11, 2005, she walked up one flight of stairs from her fourth-floor apartment to the fifth floor, and jumped out of a window, in an unsuccessful attempt to commit suicide. Prior to this incident, there had never been a suicide attempt at the Beverly Hills Club complex.
Kelley filed suit against Beverly Hills Club, alleging it was negligent for failing to provide a “reasonably safe living environment free of hazardous conditions in light of its knowledge that there were clients, such as [Kelley], suffering from severe mental illness residing at the Premises.” Specifically, Kelley alleged that Beverly Hills Club had a duty to:
(1) Inspect the premises prior to Kelley’s residency to discover conditions that presented a danger to persons with psychiatric illness;
(2) Seal or lock the common area windows to prevent them from being opened;
(3) Install bars or wire mesh over the windows in the common areas and in Kelley’s unit;
(4) Designate first floor units for Transitions patients;
(5) Secure the stairwell and any other means of accessing upper floors to prevent Transitions patients from accessing upper floors;
(6) Inquire with Transitions about special needs or precautions that needed to be taken for its patients after learning of her jumping history;[3] and
(7) Maintain the premises in a reasonably safe condition for residents with knowledge of their suicidal tendencies or “jump history.”
Kelley alleged that Beverly Hills Club breached these duties, and as a proximate cause of Beverly Hills Club’s negligence, Kelley was permanently injured when she jumped out the window. Beverly Hills Club moved for summary judgment, arguing that, as a matter of law, it did not owe a duty to Kelley, whose suicide attempt was an independent, intervening act. Beverly Hills Club asserted that Kelley failed to establish Beverly Hills Club had any knowledge of Kelley’s mental status or suicidal tendencies; that Beverly Hills Club had any control over Kelley; or that it was foreseeable Kelley would attempt suicide by jumping out of a window.
The trial court granted Beverly Hills Club’s motion for summary judgment and this appeal followed. Kelley argues that Beverly Hills Club owed her a duty to undertake proper preventive or safety measures because it knew, or should have known, the possible tendencies of Transitions residents who were receiving addiction and mental health treatment.

*957
ANALYSIS AND DISCUSSION

The issue in this case is not whether Kelley’s attempted suicide and her resulting injuries were proximately caused by the conduct of Beverly Hills Club, but whether Beverly Hills Club owed a legal duty to Kelley. This threshold question requires the trial court to determine whether the conduct of Beverly Hills Club “create[d] a foreseeable zone of risk,” thereby placing upon Beverly Hills Club the duty “either to lessen the risk or see that sufficient precautions are taken to protect others from the harm that the risk poses.” McCain v. Fla. Power Corp., 593 So.2d 500, 503 (Fla.1992).[4]
As a general rule, “there is no liability for the suicide of another [or for injuries sustained in a suicide attempt] in the absence of a specific duty of care.” Paddock v. Chacho, 522 So.2d 410, 416 (Fla. 5th DCA 1988). A duty of care has been found to exist “where a patient has surrendered himself to the custody, care and treatment of a psychiatric hospital and its staff’ and the hospital has failed “to take protective measures to prevent the patient from injuring himself.” Garcia v. Lifemark Hosps. of Fla., 754 So.2d 48, 49 (Fla. 3d DCA 1999). This specific “duty is based solely on the fact of the patient’s confinement in the hospital, and the hospital’s ability to supervise, monitor and restrain the patient.” Paddock, 522 So.2d at 416. See also Lawlor v. Orlando, 795 So.2d 147 (Fla. 1st DCA 2001) (recognizing that, while Florida law imposes a duty on a psychotherapist for failure to safeguard a patient from harming himself in a custodial setting, a psychotherapist owes no legal duty to prevent a suicide by a patient who was being treated in an outpatient setting and had showed no indication of suicidal tendencies).
In essence, Kelley asserts that the Beverly Hills Club apartments served as the equivalent of a custodial setting and, when combined with its general knowledge that Transitions provides clients with addiction and mental health treatment, created a duty upon Beverly Hills club to take reasonable measures to prevent Kelley from attempting suicide. We disagree.
The material undisputed facts are:
1. Beverly Hills Club had no particularized knowledge about Kelley or about any specific treatment she (or any other client) received from Transitions.
2. Beverly Hills Club had no knowledge as to whether Kelley had any suicidal tendencies.
3. Beverly Hills Club had no control over Kelley and her movements within the complex, nor did Beverly Hills Club have any direct dealings with Kelley.
4. Beverly Hills Club leased the apartments to Transitions, who then assigned Kelley to a fourth-floor apartment. Kelley did not enter into a lease or other agreement with Beverly Hills Club.
*958 In Rafferman v. Carnival Cruise Lines, Inc., 659 So.2d 1271 (Fla. 3d DCA 1995), this court examined the liability of a ship owner for its failure to prevent the suicide of a crewman. We held that the ship owner had no duty to protect a crewman from himself unless there is evidence the crewman “had taken ‘actions which indicate that [he] may do harm to others or to himself.’ ” Id. at 1272. This Court noted that in the absence of such evidence, a defendant will not be liable “even in the extreme situation which occurs when a patient of a mental hospital — who by definition is suffering from psychiatric difficulties of some kind — has given no previous indication that his mental illness might lead to suicide.” Id. at 1273.
This Court has thus recognized that it is the suicidal tendencies of a specific person — not an undifferentiated knowledge about a group of individuals who may be receiving some type of drug, alcohol or mental health treatment — which is determinative of the existence of a duty owed to that person. Kelley’s assertion that Beverly Hills Club owed a duty to each of Transitions’ clients is, therefore, incorrect. See, e.g., Timson v. Juvenile & Jail Facility Mgmt. Servs., Inc., 355 Fed.Appx. 283 (11th Cir.2009) (holding absent evidence of a prisoner’s suicidal tendencies, it was not reasonably foreseeable that he would commit suicide, and prison management company was not liable as a matter of law).

CONCLUSION

Because the material undisputed facts establish that Beverly Hills Club had no custody or control over Kelley, and had no knowledge regarding Kelley’s condition, treatment, or suicidal tendencies, Beverly Hills Club’s conduct in leasing apartment units to Transitions did not “create[] a foreseeable zone of risk.” McCain, 593 So.2d at 503. Accordingly, Beverly Hills Club owed no legal duty to Kelley to take precautions to protect Kelley from her attempted suicide. Summary judgment was properly granted.
Affirmed.

. The rental agreement was signed by a representative of Transitions. None of the Transitions clients signed a rental agreement with Beverly Hills Club.

. Beverly Hills Club asserts that Transitions never requested any windows or doors to be locked or barred.

. There was no evidence that Kelley had a "jumping history” or that Beverly Hills Club knew or was made aware of such a history or of any suicidal tendencies of Kelley.

. In McCain, the Supreme Court observed that the duty element ordinarily emanates from four potential sources: "(1) legislative enactments or administration regulations; (2) judicial interpretations of such enactments or regulations; (3) other judicial precedent; and (4) a duty arising from the general facts of the case.” Id. at 503 n. 2 (citing Restatement (Second) of Torts § 285 (1965)). The Court explained that, in making the threshold legal determination of the existence of a duty, the trial court "must make some inquiry into the factual allegations. The objective, however, is not to resolve the issues of comparative negligence or other specific factual matters relevant to proximate causation, but to determine whether a foreseeable, general zone of risk was created by the defendant’s conduct.” Id. at 502 n. 1.