VAN NORTWICK, J.
Rebecca A. Tuten appeals a final order dismissing with prejudice her negligence action against appellees, Alexander Fari-borzian, M.D., and Meridian Behavioral Healthcare, Inc., a psychiatric facility. For the reasons that follow, we affirm.
Rebecca Tuten’s husband, James, began receiving outpatient care at Meridian in September 2007 for depression and suicidal ideations. He was voluntarily admitted to Meridian after attempting suicide in November 2007. After three days, upon his request, he was released with medication. Two months later, James Tuten again attempted suicide by taking an overdose of psychiatric medication. Following a stay in the intensive care unit at a local hospital, he was admitted to Meridian on February 5, 2008, and came under the care of appellee, Alexander Fariborzian, a psychiatrist. On his third day at Meridian, James Tuten requested a discharge, but his request was denied by Dr. Fariborzian. On February 8, 2008, on the fourth day of his stay, a Meridian administrator filed a petition for involuntary placement and a petition for adjudication of incompetence to consent to treatment pursuant to the Baker Act. Both petitions were supported by the opinion of Dr. Fariborzian.
A hearing was eventually scheduled for February 15, 2008. On February 13, James Tuten requested his release from Meridian and Dr. Fariborzian certified that Tuten was competent to provide consent for a release. He was released on that date with an order to receive followup care. The next day, James Tuten shot his wife and then fatally shot himself.
Rebecca Tuten filed a wrongful death action asserting negligence against Dr. Fariborzian and Meridian. Her initial complaint was dismissed without prejudice. In her amended complaint Mrs. Tuten alleged, in count one, that Dr. Fariborzian was negligent in his treatment of the deceased by breaching the applicable standard of care when he certified that Mr. Tuten was competent to provide consent and by failing to continue inpatient care; in count two, that Meridian was vicariously liable for the negligence of Dr. Fariborzi-an; and, in count three, that Meridian was negligent by discharging Mr. Tuten. Meridian and Dr. Fariborzian moved to dismiss, and after a hearing, the trial court granted dismissal with prejudice, noting that no amendment to the complaint could state a cause of action.
Mrs. Tuten raises three issues on appeal. First, she argues that the trial court erred in dismissing her amended complaint because, under the Baker Act, chapter 394, Florida Statutes, also known as the Florida Mental Health Act, Meridian and Dr. Fariborzian had the duty to keep James Tuten within the facility until a trial court ruled on the petition for involuntary placement. Second, she asserts that, apart from the Baker Act, Meridian and Dr. Fariborzian owed James Tuten a duty of care which was breached upon his release. Finally, she claims that the trial court erred in refusing to allow a third amendment of her complaint.
Turning first to the argument that the Baker Act creates a duty not to release a patient under treatment until a trial court has ruled upon a pending petition for involuntary placement, we note that section 394.469, Florida Statutes (2008), provides that “[a]t any time a patient is found to no longer meet the criteria for involuntary placement,” (emphasis added), the fa *1066 cility administrator is required to discharge the patient (not under criminal charge), transfer the patient to voluntary status, or place an improved patient (not under a criminal charge) on convalescent status in a community facility. There is no limitation stated under the Baker Act on this obligation to discharge a patient who no longer warrants involuntary placement.
The statutory provisions for committing a patient to involuntary placement do not expressly provide that, once a petition for involuntary placement has been filed, it cannot be withdrawn. In fact, a plain reading of section 394.469 would indicate that a petition could be withdrawn prior to a ruling. Also, the grant by a court of a petition for involuntary placement requires proof that a patient meets the criteria outlined in section 394.467(l)(a) and (b),[1] and the criteria must be established by clear and convincing evidence. Since Dr. Fariborzian, the treating physician, concluded that, in his professional opinion, James Tuten could determine for himself whether commitment was necessary, there was no proof Meridian or Fariborzian could offer in continuing support of a petition for involuntary placement.
Further, as this court observed in Handley v. Dennis, 642 So.2d 115, 116 (Fla. 1st DCA 1994),
One of the findings that must be made to support an order of involuntary placement in a state mental hospital is that “all available less restrictive treatment alternatives which would offer an opportunity for improvement ... have been judged to be inappropriate.” § 394.467(l)(b) Fla. Stat. (1998). The state must be able to support this finding when the patient is first committed and all times during the course of the patient’s commitment. If a patient improves and is able to function in an “available less restrictive environment” then the State has no alternative but to place the patient in that environment. To do otherwise, would violate the constitutional rights of the patient as well as the plain requirements of the Baker Act.
(Emphasis added).
At the time of James Tuten’s commitment to Meridian, involuntary inpatient placement still required clear and convincing evidence that “all available less restrictive treatment alternatives which would offer an opportunity for improvement ... have been judged to be inappropriate.” § 394.467(l)(b), Fla. Stat. (2008). Given the professional opinion of Dr. Fariborzian, the treating physician, that Tuten was competent enough to give or withhold consent for treatment, involuntary placement *1067 in Meridian would have been inconsistent with the mandate of section 394.467(l)(b).
As for the argument that a common law duty exists which required Meridian and Dr. Fariborzian to keep James Tuten committed against his will, despite the professional opinion of his treating physician that Tuten had become competent enough to make his own decision regarding commitment, we cannot agree that such a duty exists under the undisputed facts in this case. Because the “internal workings of the human mind remain largely mysterious,” to impose a general duty on a psychiatrist would require such doctors to have the gift of “clairvoyance.” Garcia v. Lifemark Hospitals of Florida, 754 So.2d 48, 49 (Fla. 3d DCA 1999) (quoting Tarasoff v. Regents of Univ. of California, 17 Cal.3d 425, 131 Cal.Rptr. 14, 34, 551 P.2d 334, 354 (1976) (Mosk, J., concurring and dissenting)). We agree with the reasoning of the Fifth District in Paddock v. Chacko, 522 So.2d 410, 413-15 (Fla. 5th DCA 1988):
The practice of psychiatry has come a long way from the ancient practice of confining persons with aberrant behavior in institutions or asylums. It has been recognized that mental illness may be caused or intensified by institutionalizing mental patients. Emerging from these roots, the science and profession of psychiatry has burgeoned into a multifaceted social institution. The practice of psychiatry is no longer limited to the institutionalization of the mentally ill. Professionals in the practice of psychiatry and psychology now offer an innumerable variety of remedial therapies to the troubled and ailing souls of modern society. We are impressed with Judge Jorgensen’s observations in his dissenting opinion in Nesbitt v. Community Health of South Dade, Inc., 467 So.2d 711 (Fla. 3d DCA 1985) where, in a different factual context he noted that
The science of psychiatry represents the penultimate grey area. Numerous cases underscore the inability of psychiatric experts to predict, with any degree of precision, an individual’s propensity to do violence to himself or others. Indeed, “[psychiatrists themselves would be the first to admit that however desirable an infallible crystal ball might be, it is not among the tools of their profession.” People v. Burnick, 14 Cal.3d 306, 326, 121 Cal.Rptr. 488, 501, 535 P.2d 352, 365 (1975).
A substantial body of literature suggests that the psychiatric field cannot even agree on appropriate diagnosis, much less recommend a course of treatment.
467 So.2d at 717.
A psychiatrist, or any other doctor, may “order” his patient to comply with a prescribed treatment. When, however, the plaintiff speaks of her psychiatrist’s duty to “order” hospitalization, it appears that something more is meant than the colloquial understanding of “doctor’s orders.” Essentially, the plaintiff argues that [the psychiatrist] was obligated to demand and insure that his patient be hospitalized for the benefit of her own safety.
[[Image here]]
We decline to force every psychiatrist to navigate between Scylla and Charybdis, in deciding whether or not to involuntarily detain and examine a patient.[2]
*1068 (Other internal citations omitted; bold added). Thus, explained the Chacko court, the law of this state does not impose a duty upon a psychiatrist to hospitalize or otherwise involuntarily detain a patient.
The Chacko court, however, did indicate that “[w]here a patient has surrendered himself to the custody, care and treatment of a psychiatric hospital and its staff, liability may be predicated upon the hospital’s failure to take protective measures to prevent the patient from injuring himself,” 522 So.2d at 417, while the patient is in custody. This specific “duty is based solely on the fact of the patient’s confinement in the hospital, and the hospital’s ability to supervise, monitor and restrain the patient.” Id. at 416. The case before us is factually distinguishable from the exception described in Chacko. Tuten was not in the custody of appellees Meridian or Fariborzian when he killed himself and injured his wife. These acts of violence occurred outside of the scope of the facility’s range of observation and control. See Santa Cruz v. Northwest Dade Community Health, 590 So.2d 444 (Fla. 3d DCA 1991) (holding the Baker Act imposes no affirmative obligation on the part of psychiatrist or mental health center to hospitalize a patient or commence proceedings for involuntary placement, and they could not be held liable for failing to do so to those subsequently injured by the patient).
It is significant that the case law establishes that there is no duty to warn that a patient may be dangerous, even when the patient is involuntarily committed as a result of a Baker Act proceeding. Judge Altenbernd, writing for the court in Mental Health Care, Inc. v. Stuart, explained that no such duty exists because of “the inherent unpredictability associated with mental illness and the ‘near-impossibility of accurately or reliably predicting dangerousness.’ ” 909 So.2d 371, B74 (Fla. 2d DCA 2005) (quoting Boynton v. Burglass, 590 So.2d 446, 450 (Fla. 3d DCA 1991)). In holding no duty to warn exists, the Mental Health Care court relied heavily on Boynton, which also held no duty on the part of a psychiatrist exists to warn others about a patient. Explained the Boynton court,
to impose a duty [on a psychiatrist] to warn or protect third parties would require the psychiatrist to foresee a harm which may or may not be foreseeable, depending on the clarity of his crystal ball. Because of the inherent difficulties psychiatrists face in predicting a patient’s dangerousness, psychiatrists cannot be charged with accurately making those predictions and with sharing those predictions with others.
590 So.2d at 450. Similarly, the court in Santa Cruz v. Northwest Dade Community Health Ctr., Inc., 590 So.2d at 445, held that a psychiatrist or a psychiatric facility did not have the duty to warn others not within its custody that a patient, formerly in custody, might be dangerous.
 All of these authorities emphasize the unpredictability and inexactness inherent in the practice of psychiatry. Thus, because the future behavior of a psychiatric patient is unknowable, under Florida law risk of harm is not foreseeable and therefore no duty exists to lessen the risk or protect others from the type of risk which a psychiatric patient might pose. As the Florida Supreme Court has explained, the “requirement of reasonable, general foresight is the core of the duty element.” McCain v. Fla. Power Corp., 593 So.2d 500, 503 (Fla.1992).
Finally, as to the refusal of the trial court to allow Mrs. Tuten the opportunity to file a second amended complaint, rule 1.190(a) of the Florida Rules of Civil *1069 Procedure provides for the right to amend once before a responsive pleading is served, and thereafter, only by leave of the court. Although leave of the court shall be freely given when justice requires, the court need not allow an amendment that would be futile. Thompson v. Publix Supermarkets, Inc., 615 So.2d 796, 797 (Fla. 1st DCA 1993). Further, the trial court “has wide discretion on procedural matters including requests to amend pleading.” Fla. R. Civ. P. 1.190 Author’s Comment 1967. Here, there has been no showing by appellant as to possible amendments to the complaint that would not be futile. We find no abuse of discretion.
The final order is AFFIRMED.
DAVIS and THOMAS, JJ., concur.

. The criteria are:
(a) He or she is mentally ill and because of his or her mental illness:
1.a. He or she has refused voluntary placement for treatment after sufficient and conscientious explanation and disclosure of the purpose of placement for treatment; or b. He or she is unable to determine for himself or herself whether placement is necessary; and
2.a. He or she is manifestly incapable of surviving alone or with the help of willing and responsible family or friends, including available alternative services, and, without treatment, is likely to suffer from neglect or refuse to care for himself or herself, and such neglect or refusal poses a real and present threat of substantial harm to his or her well-being; or
b. There is substantial likelihood that in the near future he or she will inflict serious bodily harm on himself or herself or another person, as evidenced by recent behavior causing, attempting, or threatening such harm; and
(b) All available less restrictive treatment alternatives which would offer an opportunity for improvement of his or her condition have been judged to be inappropriate.

. The Chacko court explained this reference as follows: " 'Incidit in Scyllam qui vult vi-tare Charybdim.' ” This Latin proverb means that in our eagerness to avoid one evil, we often fall into greater.” 522 So.2d at 415 n. 7.